668                    June 16, 2016                    No. 36

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

WILLIAM MICHAEL ALTHOUSE,
*Petitioner on Review.*

(CC 11C48471; CA A152626; SC S062909)

On review from the Court of Appeals.*

Argued and submitted September 14, 2015.

Shawn E. Wiley, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Sara F. Werboff and Shauna M. Curphey, Portland, filed the brief for *amicus curiae* Oregon Justice Resource Center.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, Brewer, and Nakamoto, Justices.**

KISTLER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

\*   On appeal from Marion County Circuit Court, Lindsay Partridge, Judge. 266 Or App 548, 339 P3d 470 (2014).

\**   Linder, J., retired December 31, 2015, and did not participate in the decision of this case.

**KISTLER, J.**

Defendant was convicted in 2011 of felony public indecency after previously having been convicted of three other felony sex crimes. Pursuant to ORS 137.719(1), the trial court sentenced him to life imprisonment without the possibility of parole. Throughout this litigation, defendant has argued that, as applied to him, a sentence of life imprisonment without the possibility of parole violates Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution. The Court of Appeals affirmed the trial court's judgment without opinion. *State v. Althouse*, 266 Or App 548, 339 P3d 470 (2014). We allowed defendant's petition for review to consider two issues: whether ORS 138.222(2)(a) bars direct appellate review of a presumptive sentence imposed pursuant to ORS 137.719(1) and, if not, whether defendant's sentence is unconstitutional as applied. We hold that defendant's sentence is both reviewable and constitutional. We accordingly affirm the Court of Appeals decision and the trial court's judgment.

## I.   DIRECT APPELLATE REVIEW

We begin with the state's argument that ORS 138.222(2)(a) forecloses direct appellate review of defendant's sentence. Two statutes are relevant to that argument. ORS 138.222(2)(a) provides that "[a]ny sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission" may not be reviewed on direct appeal.[1] ORS 137.719(1) provides that the presumptive sentence for a defendant's third felony sex conviction is life imprisonment without the possibility of parole.[2] A trial court may impose a lesser sentence if doing

---

[1] The state acknowledges that defendant's challenge to his sentence may be reviewed on post-conviction, but it argues that ORS 138.222(2)(a) precludes direct appellate review of that challenge.

[2] ORS 137.719 provides, in part:

"(1) The presumptive sentence for a sex crime that is a felony is life imprisonment without the possibility of release or parole if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence.

"(2) The court may impose a sentence other than the presumptive sentence provided by subsection (1) of this section if the court imposes a departure sentence authorized by the rules of the Oregon Criminal Justice Commission based upon findings of substantial and compelling reasons."

so is "authorized by the rules of the Oregon Criminal Justice Commission" and if the trial court finds that there are substantial and compelling reasons for departing from the presumptive sentence. ORS 137.719(2).

In this case, the trial court did not impose a downward departure sentence pursuant to ORS 137.719(2). Rather, it imposed the presumptive sentence provided in ORS 137.719(1). It follows, the state argues, that ORS 138.222(2)(a) precludes defendant from challenging that sentence on direct appeal. In making that argument, the state recognizes that ORS 138.222(2)(a) applies only to presumptive sentences "prescribed by the rules of the Oregon Criminal Justice Commission." It also recognizes that ORS 137.719(1) prescribed the presumptive sentence that the trial court imposed. It argues, however, that the Oregon Criminal Justice Commission's rules define the term "presumptive sentence" as meaning both a presumptive sentence specified in a sentencing guidelines "grid block" and "a sentence designated as a presumptive sentence by statute." *See* OAR 213-003-0001(16) (defining "presumptive sentence").[3] The state reasons that, because the Commission's administrative rules designate a life sentence imposed pursuant to ORS 137.719(1) as a "presumptive sentence" and because the Commission's rules also direct trial courts to impose presumptive sentences that the guidelines provide,[4] a life sentence imposed pursuant to ORS 137.719(1) is a "presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission," as that phrase is used in

---

[3] As initially promulgated, the Commission's rules provided:

"'Presumptive sentence' means the sentence provided in a grid block for an offender classified in that grid block by the combined effect of the crime seriousness ranking of the current crime of conviction and the offender's criminal history."

*Former* OAR 253-03-001(15) (1988). In 2001, the legislature enacted ORS 137.719, which specifies a presumptive sentence for a defendant's third felony sex conviction. *See* Or Laws 2001, ch 884, § 4. Afterwards, the Commission amended and renumbered the definition of "presumptive sentence" in its administrative rules to include statutorily designated presumptive sentences. *See* OAR 213-003-0001(16) (2007) (adding the current phrase "or a sentence designated as a presumptive sentence by statute" to the definition of presumptive sentence).

[4] OAR 213-008-0001 provides that, except as otherwise specified, a sentencing court "shall impose the presumptive sentence provided by the guidelines unless the judge finds substantial and compelling reasons to impose a departure."

ORS 138.222(2)(a). It follows, the state concludes, that ORS 138.222(2)(a) precludes our review of defendant's challenge to his sentence.

In analyzing the state's argument, we follow our customary methodology. We begin with the text and context of ORS 138.222(2)(a) and, if appropriate, turn to the legislative history of that statute. *See State v. Walker*, 356 Or 4, 13, 333 P3d 316 (2014) (describing statutory construction methodology).

A.  *Text*

ORS 138.222 provides, in part:

"(2)   Except as otherwise provided in subsection (4)(c) of this section, on appeal from a judgment of conviction entered for a felony committed on or after November 1, 1989, the appellate court may not review:

"(a)   Any sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission."

The text of ORS 138.222(2)(a) bars direct appellate review of a sentence if three prerequisites are met. First, the challenged sentence must be a presumptive sentence.[5] Second, the challenged sentence must be "within [a] presumptive sentence." Finally, the challenged sentence must be "prescribed by the rules of the Oregon Criminal Justice Commission."

There is no dispute that the first prerequisite is satisfied. A sentence of life imprisonment without possibility of parole imposed pursuant to ORS 137.719(1) is a "presumptive sentence." The statute designates it as such. *See* ORS 137.719(1) (providing that the "presumptive sentence" for a defendant's third felony sex crime is life imprisonment without the possibility of parole).

The second prerequisite—that the sentence be "within" a presumptive sentence—poses a bigger hurdle for the state. ORS 137.719 imposes a presumptive sentence of

---

[5] The text does not expressly require that the challenged sentence be a presumptive sentence. However, we presume that a sentence that is "within [a] presumptive sentence" will be a presumptive sentence.

life imprisonment without parole for a third conviction of certain felony sex crimes. However, life without parole is not a sentence "within" another sentence; that is, life without parole is not a sentence that falls within a range of possible sentences marked by minimum and maximum levels of severity. Rather, life without parole is a fixed term of imprisonment whereby a defendant remains incarcerated for the remainder of his or her natural life, however long that may be. While a sentence imposed pursuant to ORS 137.719(1) is a presumptive sentence, it is not "within" a presumptive sentence or range of presumptive sentences, as that term is ordinarily understood.

The third prerequisite—that the sentence be within the presumptive sentence "prescribed by the rules of the Oregon Criminal Justice Commission"—also cuts against the state's position. Ordinarily, the Commission's rules establish "grid blocks" that prescribe a range of presumptive sentences for a crime, depending on the severity of the crime and the offender's criminal history. *See State v. Speedis*, 350 Or 424, 427, 256 P3d 1061 (2011). Although the grid blocks established by the Commission's rules are not effective until the legislature approves them, the legislature does not prescribe the presumptive sentences that the Commission establishes by rule. *See State v. Lane*, 357 Or 619, 624, 355 P3d 914 (2015) (explaining that, in approving the Commission's sentencing guidelines rules, the legislature is not "formally adopting them as statutes").

The presumptive sentence that the trial court imposed in this case departs from that usual model in two respects. First, in this case, a statute—ORS 137.719(1)—prescribed the presumptive sentence that the court imposed, and the statute did so independently of anything that the Commission did or did not do. Second, the same thing cannot be said for the Commission's rule. Rather, the applicable rule merely cross-references the statute. It defines a presumptive sentence, in part, as "a sentence designated as a presumptive sentence by statute." OAR 213-003-0001(16). If the legislature repealed ORS 137.719, no presumptive life sentence for a defendant's third felony sex offense would be prescribed by rule or otherwise.

To be sure, it is possible to say, as the state does, that the Commission's rules prescribe by cross-reference the same sentence that ORS 137.719(1) prescribes independently of the rules. However, the state's rule-based argument does not fit comfortably with the usual understanding of the phrase "prescribed by the rules of the Oregon Criminal Justice Commission" found in ORS 138.222(2)(a). Moreover, as explained above, it is difficult to describe a life sentence prescribed either directly by ORS 137.719(1) or derivatively by the Commission's rules as being "within" a presumptive sentence or range of presumptive sentences. *See* ORS 138.222(2)(a) (imposing that requirement). Focusing solely on the text of the applicable statutes and rules, we are doubtful that the state can shoehorn a presumptive sentence imposed pursuant to ORS 137.719(1) into the prohibition on direct appellate review found in ORS 138.222(2)(a).

B.   *Context*

The context of ORS 138.222(2)(a) includes "'the pre-existing common law and the statutory framework within which the law was enacted.'" *Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (quoting *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998)). The legislature enacted what is now codified as ORS 138.222(2)(a) in 1989. *See* Or Laws 1989, ch 790, § 21. Before then, Oregon statutes set a maximum indeterminate sentence for each class of felonies, and trial courts were free in individual criminal cases to impose a sentence anywhere within the statutory maximum. *See* Thomas A. Balmer, *Some Thoughts on Proportionality*, 87 Or L Rev 783, 791-92 (2008) (describing shift from indeterminate to determinate sentencing schemes); ORS 161.605 (specifying maximum indeterminate sentences for Class A, B, and C felonies). For example, aggravated first-degree theft is a Class B felony, ORS 164.057(2), and the maximum sentence for a Class B felony is 10 years, ORS 161.605(2). Before 1989, if a defendant were convicted of that offense, the sentencing court could impose an indeterminate sentence anywhere within that 10-year range after considering a broad array of evidence. *See Speedis*, 350 Or at 427.

The wide latitude of sentencing choices that characterized indeterminate sentencing "sometimes led to disparate

sentences for similarly situated defendants." *Id*. As a result of that problem, the 1985 Oregon Legislature established what is now known as the Oregon Criminal Justice Commission and directed the Commission to develop recommendations for criminal sentencing. *See* Or Laws 1985, ch 558, §§ 2-3. In response to the legislature's directive, the Commission created a grid of presumptive sentences, where the appropriate grid block for a conviction lies at the intersection of two axes—one axis representing the seriousness of the crime of conviction and the other axis representing a defendant's criminal history. *See Speedis*, 350 Or at 427 (describing sentencing guidelines grid blocks); OAR 213-004-0001(1). Once a sentencing court determines the grid block within which a defendant's conviction falls, the grid block specifies a range of presumptive sentences for that conviction, and the sentencing court may impose a sentence within that range. *See* OAR 213-005-0001(1) (stating that "the presumptive sentence shall be a term of imprisonment within the durational range of months stated in the grid block").[6]

In 1989, the Oregon legislature approved the sentencing guidelines that the Commission had promulgated and made them applicable to felonies committed on or after November 1, 1989. *See* Or Laws 1989, ch 790, §§ 2, 87. The legislature also provided that sentences within the sentencing grid blocks will "constitute presumptive sentences." *Id*. § 95. A trial court need not impose a presumptive sentence, however. Rather, the 1989 act also authorized trial courts to impose departure sentences "outside the presumptive sentence or sentence range made presumptive *** for a specific offense if it finds *** there are substantial and compelling reasons justifying a deviation from the presumptive sentence." *Id*. § 39; *see id*. § 95.

In the same bill in which the legislature approved the sentencing guidelines and directed courts to impose a presumptive sentence provided by the applicable grid block,

---

[6] For example, aggravated first-degree theft is a Class B felony. Under the sentencing guidelines, aggravated first-degree theft is ranked at "Crime Category 6" if the amount of loss is greater than $50,000. *See* OAR 213-018-0010(1). If a defendant is convicted of aggravated first-degree theft and is classified in criminal history category A, the sentencing guidelines prescribe a presumptive sentence of 25 to 30 months in prison. *See* OAR ch 213, App 1.

the legislature also enacted the statute that currently is codified as ORS 138.222. *See id.* § 21. Specifically, the 1989 legislature precluded appellate review of "[a]ny sentence that is within the presumptive sentence prescribed by the rules of the [Oregon Criminal Justice Commission]," while authorizing judicial review of departure sentences. *Compare id.* § 21(2)(a) (precluding review of presumptive sentences), *with id.* § 21(3) (authorizing review of departure sentences).

Read in the context of the larger bill of which it was a part, the phrase in ORS 138.222(2)(a)—"[a]ny sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission"—can have only one referent: The phrase refers to a sentence that comes within the range of presumptive sentences prescribed by a sentencing guidelines grid block. Conversely, if a trial court does not impose a sentence within the presumptive sentence set out in a grid block but imposes a departure sentence instead, then the departure sentence may be reviewed on appeal. *See* ORS 138.222(3) (so providing).

That is the conclusion that this court drew from the text and context of ORS 138.222(2)(a) in *State ex rel Huddleston v. Sawyer*, 324 Or 597, 932 P2d 1145, *cert den*, 522 US 994 (1997). As this court explained in *Huddleston*, ORS 138.222(2)(a) "refers *only* to 'the sentence provided in a grid block for an offender classified in that grid block by the combined effect of the crime seriousness ranking of the current crime of conviction and the offender's criminal history.'" *Id.* at 605 (quoting OAR 253-03-001(16) (1995)) (emphasis added). The court in *Huddleston* drew the same conclusion from the legislative history of ORS 138.222(2)(a). *See id.* at 606-07 (discussing legislative history). If, as this court held in *Huddleston* and the text, context, and legislative history of ORS 138.222(2)(a) confirm, the phrase in ORS 138.222(2)(a)—"[a]ny sentence within the presumptive sentence prescribed by the rules" of the Commission— "refers only to 'the sentence provided in a grid block for an offender classified in that grid block,'" *Huddleston*, 324 Or at 605, then ORS 138.222(2)(a) does not preclude review of a presumptive sentence that is not contained within a grid block. Specifically, ORS 138.222(2)(a) does not preclude

review of a presumptive life sentence imposed pursuant to ORS 137.719(1).

The state argues, however, that we should not take *Huddleston* at face value, at least in the context of this case. The state reasons that, when this court decided *Huddleston*, the legislature had not yet enacted ORS 137.719, nor had the Commission promulgated rules that defined a "presumptive sentence" as meaning "a sentence designated as a presumptive sentence by statute."[7]

In our view, that sequence of events cuts against the state's argument. Because the 1989 legislature intended that ORS 138.222(2)(a) would apply only to presumptive sentences contained within a grid block, *Huddleston*, 324 Or at 605, the state's argument necessarily depends on one of two propositions: either (1) the 2001 legislature that enacted ORS 137.719 intended that presumptive sentences imposed outside of a grid block be included within the class of presumptive sentences that ORS 138.222(2)(a) shields from direct review or (2) the 1989 legislature gave the Commission authority to enlarge by rule the class of sentences to which ORS 138.222(2)(a) applies.

The state does not identify anything in the text, context, or legislative history of ORS 137.719 that suggests that, in enacting that statute, the 2001 legislature intended to expand the class of presumptive sentences that would be shielded from direct appellate review, nor are we aware of any basis for attributing that intent to the 2001 legislature.

The state's argument accordingly appears to rest on the second proposition noted above: that the Commission has authority to alter the meaning of ORS 138.222(2)(a). On that issue, the legislature has authorized the Commission to amend presumptive sentences included within a grid block. *See* ORS 137.667(1) (authorizing the Commission to adopt "necessary modifications to the crime seriousness scale of the guidelines" for new and legislatively modified crimes

---

[7] The legislature enacted ORS 137.719 in 2001, 12 years after it enacted ORS 138.222(2)(a). *See* Or Laws 2001, ch 884, § 4. Five years later, in 2006, the Commission amended the definition of "presumptive sentence" to include the current phrase "or a sentence designated as a presumptive sentence by statute." OAR 213-003-0001(16) (2007).

and to "classify offenses as person felonies or person misdemeanors for the purposes of the rules"). However, the state points to no statute that gives the Commission authority to shield presumptive sentences that are not contained within a grid block from appellate review. To be sure, the legislature must approve the sentencing guidelines for them to be effective. However, legislative approval does not convert the Commission's rules into statutes, nor does it give the Commission power to trump by rule what a statute provides. *See Lane*, 357 Or at 624.

Whatever the Commission may have envisioned when it expanded its rule-based definition of presumptive sentence in 2006, the Commission has no authority to amend by rule the scope of ORS 138.222(2)(a). Because a sentence imposed pursuant to ORS 137.719(1) does not come within the class of sentences to which ORS 138.222(2)(a) applies, we turn to defendant's argument that a sentence of life imprisonment without possibility of parole, as applied to him, violates the proportionality clause of Article I, section 16, of the Oregon Constitution, as well as the Eighth Amendment to the United States Constitution.

## II.   CONSTITUTIONAL CHALLENGES

In considering defendant's constitutional challenges to his sentence, we first set out the relevant sentencing facts. We then discuss the legal principles applicable to defendant's state constitutional challenge and explain why his sentence is not constitutionally disproportionate in violation of Article I, section 16. Finally, we turn to defendant's Eighth Amendment challenge.

A.   *Sentencing Facts*

The facts relevant to defendant's as-applied challenge to his sentence are not limited to the facts that gave rise to his 2011 conviction for public indecency. That is so for two reasons. First, the trial court sentenced defendant pursuant to a repeat-offender statute, which authorizes an enhanced sentence for a third felony sex conviction. When a court imposes an enhanced sentence based on a repeat offender statute, we consider a defendant's criminal history in determining whether the sentence is proportionate to

the crime. *See State v. Wheeler*, 343 Or 652, 673, 175 P3d 438 (2007) (explaining that, for repeat offender sentences, "the analysis must focus not only on the latest crime and its penalty, but on the defendant's criminal history"); *State v. Smith*, 128 Or 515, 525-26, 273 P 323 (1929) (same). Second, defendant has raised an as-applied challenge to his sentence, which requires consideration not only of his past convictions but also of his past instances of relevant uncharged misconduct. *See State v. Rodriguez/Buck*, 347 Or 46, 78, 217 P3d 659 (2009) ("Traditional understandings of proportionality, as well as this court's cases, require us to consider whether a defendant is a repeat offender by considering previous criminal convictions and whether there is evidence of multiple instances of uncharged wrongful conduct."). We accordingly summarize defendant's history of charged and uncharged sex offenses, which we take from the uncontested preliminary sentence investigation.[8]

In 1982, defendant was convicted of first-degree sexual abuse for touching the vaginal area and buttocks of his eight-year-old daughter. He later admitted that, during the same time period, he fondled his five-year-old son and that the abuse of his children occurred more than once. As a result of his 1982 sexual-abuse conviction, defendant initially was placed on probation for three years and participated in a sex offender treatment program. In 1983, he was terminated from the treatment program because "he simply chose to maintain his dangerous patterns of deviant thinking." In 1985, defendant's probation was revoked, and he was sentenced to five years in prison. The presentence report does not specify the grounds for revoking defendant's probation.

In 1993, a woman reported to the Seaside, Oregon police that she had seen defendant talking to her five-year-old son outside their home. Defendant had put his arm around the boy "like he was going to pick him up." When asked what he was doing, defendant replied that "he was just giving the child a hug." Although defendant was asked

---

[8] The trial court directed that a presentence report be prepared so that it could decide whether to impose a downward departure sentence. At the sentencing hearing, defendant did not contest the accuracy of any fact set out in the report.

to leave, he returned to the boy's house twice. Later, the boy told his mother that defendant had touched him on his penis.

Two days later, defendant approached a family on the beach at Seaside and told them he was trying to find a lost dog. The parents went out in their boat, leaving one of their children—a nine-year-old boy—alone. The boy went back to his family's motor home. Defendant followed and asked if he could come inside to play a board game with the boy. After the boy let defendant inside, defendant took off his shirt. The boy became uncomfortable and tried to get out of the house. Defendant stopped him, forced the boy into the bathroom where he put a shirt over the boy's mouth, and orally sodomized him. Defendant then forced the boy to perform oral sex on him. The boy got out of the house and identified defendant to other persons in the motor home park.

As a result of those acts, defendant was convicted of first-degree sodomy, first-degree sexual abuse, and first-degree burglary. While defendant was waiting to be sentenced on those convictions, he was involved in a separate incident in Hillsboro, Oregon. A different nine-year-old boy, whom defendant knew, saw defendant "looking at him through the sliding glass door" of the boy's home. Defendant started to open the glass door, but the boy closed the door and locked it. The boy called his mother, who saw defendant running away from the bushes near their patio. The police arrived and saw defendant "staggering through the parking lot of the apartment complex with no pants on." Defendant was arrested for second-degree criminal trespass.[9]

After the incident in Hillsboro, the Clatsop County Circuit Court sentenced defendant to approximately 10 years in prison for the convictions arising out of his assault on the boy in Seaside. In 2001, defendant was released from prison on post-prison supervision. Between 2001 and 2002, defendant violated the terms of his release five times.

_____

[9] It is unclear whether the Washington County District Attorney's office pursued the Hillsboro charge beyond reporting it to the sentencing court in Clatsop County. Additionally, while defendant was waiting to be sentenced on the Clatsop County charges, he was living within 500 feet of a school in violation of his release agreement.

Among other things, he went to a park and "got nude" after he saw a family a short distance away, he exposed himself in a public hot tub, he looked at pictures of nude children, and he "masturbate[ed] in front of his bedroom window on three occasions, with the windows full[y] opened so someone could see him through the open window."

In 2002, defendant was walking naked, except for a baseball cap, through a Marion County park. In investigating a complaint about defendant's behavior, the police learned that defendant was on post-prison supervision for sex crimes and was not supposed to be at a park where children congregate. They arrested him for public indecency. Later, defendant admitted to his parole officer that, while he was naked in the park, he had approached a child who was fishing in the river. A Marion County Circuit Court convicted defendant of public indecency for that offense, but it did not impose a presumptive sentence of life imprisonment without possibility of parole. Rather, the court sentenced defendant to 48 months in prison.

After serving that sentence, defendant was released on post-prison supervision in October 2006. In November 2006, defendant violated the terms of his release by viewing child pornography on the Internet and received a 10-day jail sanction. Afterwards, he received 11 more jail sanctions for violating the terms of his release. Among other things, he was arrested in 2007 after several of his neighbors saw him walking around nude. He was arrested again in 2009 for doing yard work while nude. In 2010, he was seen walking nude around a school for hearing impaired children. When the police questioned defendant about that reported behavior, defendant denied having been nude. A few days later, he absconded from supervision only to be found at a rest stop in Idaho. After being extradited to Oregon, defendant admitted to his parole officer that he had been walking nude around the children's school. He also admitted that, before he left for Idaho, he routinely walked nude in the alleys around the transitional house in downtown Salem, Stepping Out Ministries, where he had been living.

In 2011, defendant committed the offense that has given rise to this case. He sat naked off to the side of a

popular jogging path in Salem, approximately 150 feet from a middle school. The woman who reported defendant to the police told the officer that "there were children walking in the area." After his arrest, defendant explained that he has a sexual addiction and is aroused by sitting in public without his pants.

As a result of his convictions for various sex offenses, defendant frequently has engaged in sex offender treatment. After defendant's 1982 conviction for sexually abusing his daughter, Oregon State Hospital staff evaluated defendant and determined that he was a "sexually dangerous person."[10] In light of that finding, defendant was accepted into a sex-offender treatment program at the hospital, but he was subsequently terminated from that program because he "simply chose to maintain his dangerous pattern of deviant thinking." Between 1982 and 2012, defendant participated in several sex-offender treatment programs. However, he frequently discontinued his treatment in those programs and failed "to gain control over his [s]exual [a]ggression." In 2006, a psychologist concluded that defendant presented "a high risk for [s]exual aggression," noting that "he has escalated his acting out from assaulting family members to sexually assaulting complete strangers over the years." Given that history, the trial court declined to impose a downward departure sentence on defendant's fourth felony sex conviction. Instead it imposed the statutory presumptive sentence of life imprisonment without the possibility of parole.

B.  *Defendant's Constitutional Challenges*

Defendant does not argue that a life sentence without possibility of parole is facially unconstitutional; that is, he recognizes that, for some repeat sex offenders, a life sentence without possibility of parole is neither constitutionally disproportionate nor cruel and unusual. *See Wheeler*, 343 Or at 678-79 (holding that presumptive life sentence imposed pursuant to ORS 137.719(1) is facially constitutional under Article I, section 16). He argues, however, that, as applied

---

[10] A "sexually dangerous person" is one "who because of repeated or compulsive acts of misconduct in sexual matters, or because of a mental disease or defect, is deemed likely to continue to perform such acts and be a danger to other persons." ORS 426.510.

to the circumstances of his case, his sentence violates the state constitutional requirement that sentences be proportioned to the offense and the Eighth Amendment prohibition against cruel and unusual punishment. We begin with defendant's state constitutional challenge.

1.   *Article I, section 16*

Article I, section 16, provides, in part:

"Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

For the most part, this court has analyzed the requirement that "penalties shall be proportioned to the offense" separately from the related prohibition on cruel and unusual punishments. *Wheeler*, 343 Or at 666. In considering that constitutional provision, this court initially asked, without engaging in an extended inquiry, whether the length of the sentence shocked the moral sense of all reasonable people. *See, e.g.*, *State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993) (death penalty for murder committed during the course of attempted first-degree sex abuse "would not shock the moral sense of reasonable people"); *State v. Teague*, 215 Or 609, 611, 336 P2d 338 (1959) (per curiam) (18-years imprisonment for two separate forgery convictions did not shock the moral sense of reasonable people); *Sustar v. County Court of Marion Co.*, 101 Or 657, 665, 201 P 445 (1921) (six-month jail sentence and $500 fine for possessing alcohol did not "shock the moral sense of all reasonable men as to what is right and proper under the circumstances") (citing *Weems v. United States*, 217 US 349, 30 S Ct 544, 54 L Ed 793 (1910)).

In *Wheeler*, the court explained that the question whether a punishment shocked the moral sense of all reasonable people was not intended to be taken literally. 343 Or at 670. Rather, in stating that test, the court had sought "to articulate a standard that would find a penalty to be disproportionately severe for a particular offense only in rare circumstances." *Id*. That is, the standard that the court articulated was intended to reflect the principle that the

legislature has primary authority to determine the gravity of an offense and the appropriate length of punishment. *Id.* at 671. Only in those rare instances when the legislature has exceeded that authority may a court say that a particular punishment is unconstitutionally disproportionate. *Id.*

Two years later, in considering an as-applied constitutional challenge to the punishment for a single offense, this court identified three factors that bear on that inquiry:

"(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."

*Rodriguez/Buck*, 347 Or at 58. Applying those factors, the court noted that neither of the defendants in *Rodriguez/Buck* had any prior criminal history, that each of their offenses consisted of a single instance of inappropriate contact, that the contact, while inappropriate, was limited in duration and intensity, and that the conduct was at the "outer edge" of what is prohibited. Yet, each defendant received the same 75-month mandatory sentence that a person who had committed far more egregious sexual abuse would receive.

Additional considerations come into play when a court assesses the constitutionality of a statute that imposes an enhanced sentence on repeat offenders. As this court explained in *Tuel v. Gladden*, 234 Or 1, 6, 379 P2d 553 (1963),

"Habitual criminal [statutes] are based upon the belief that the criminal, as well as the crime, is a material factor to be considered in fixing the sentence. If the criminal is a menace to the community, his sentence should be aimed at offering the most protection to the community, regardless of the relative innocuousness of the particular crime for which he is now convicted."

For example, the court explained in *Smith* that ordinarily a sentence of life imprisonment for receiving stolen property (the defendant's most recent conviction that triggered the repeat offender sentence) would be "astound[ing]." 128 Or at 525. However, because the defendant in that case had "been convicted at least four times for burglariously preying upon the property and safety of others," the court held that

a life sentence was not constitutionally disproportionate. *Id.* at 526; *see Tuel*, 234 Or at 6-7 (because repeat property offender had proven that he was not likely to reform, sentence of life imprisonment without possibility of parole did not violate principle in Article I, section 15, that sentences should be based on principles of reformation).

Similarly, in the context of a statute that authorized enhanced sentences for repeat sexual offenders, this court explained that the question whether an enhanced sentence for that conduct would "shock the moral sense would, of course, depend upon the seriousness of repetitive sexual conduct of th[e] kind [punished by the statute] and the danger that it forecasts for others unless the defendant is segregated from society." *Jensen v. Gladden*, 231 Or 141, 144-45, 372 P2d 183 (1962). In *Jensen*, the defendant had been convicted of two sex offenses: contributing to the delinquency of a minor and, two years later, indecent exposure. *Id.* at 142. As a result of the second offense, the trial court sentenced the defendant under a repeat-offender statute to life imprisonment with the possibility of parole. *Id.* at 142-43. In upholding that sentence against a state constitutional proportionality challenge, this court noted that the legislature reasonably could have concluded that sex offenders "tend to be recidivists" and "progress from minor to major crimes." *Id.* at 145. It also noted that the parole board retained authority to release the defendant if it concluded that release was appropriate "to effect psychiatric rehabilitation." *Id.* at 147.

With that background in mind, we turn to defendant's argument that a life sentence without possibility of parole, as applied to his circumstances, violates Article I, section 16. Defendant argues, and we agree, that the three factors identified in *Rodriguez/Buck* should guide our resolution of his Article I, section 16, proportionality challenge. However, as we explain below, the first and third of those factors overlap in comparing the severity of the penalty and the gravity of the crimes that gave rise to the repeat-offender sentence. Additionally, the second factor identified in *Rodriguez/Buck*—the penalties imposed for related crimes—can provide a helpful perspective in comparing the severity of the penalty and the gravity of the crimes. However, the various combinations of convictions that can

give rise to an enhanced sentence can diminish the extent to which a comparison of the penalty for a single related offense will shed light on the proportionality analysis.

   a.  *First and third* Rodriguez/Buck *factors*

   The first factor identified in *Rodriguez/Buck* is a comparison of the severity of the penalty and the gravity of the offense. 347 Or at 59-63. In this case, defendant was sentenced as a repeat offender. As a result, we do not focus solely on the last offense that he committed in considering the gravity of the offense; we focus on the gravity of his criminal history. *Wheeler*, 343 Or at 673. Moreover, because defendant has raised an as-applied challenge to his sentence, we consider the specific circumstances of the charged and uncharged offenses that make up his criminal history in assessing its gravity. *See Rodriguez/Buck*, 347 Or at 78. It follows that, in considering an as-applied challenge to a sentence imposed under a repeat-offender statute, the first and third factors identified in *Rodriguez/Buck*, in large part, coalesce.

   In analyzing the gravity of the offense, defendant focuses on his most recent conviction for public indecency. He notes that a first offense for public indecency is a misdemeanor, and he contends that the specific conduct for which he was convicted in 2011 was "not particularly serious or harmful." He observes that he was "fully clothed except for his pants" when the woman on the jogging path spotted him, and he says that she had to look closely to see his exposed genitals. In defendant's view, his most recent conviction does not suggest that he poses a risk of harm to others. An *amicus* brief filed in support of defendant makes the same point but in a broader fashion. The *amicus* asserts that persons "convicted of public indecency simply do not pose the same risk of violent or sexual recidivism when compared to sexual offenders as a group or criminal offenders in general."

   We may agree with defendant that public indecency, considered in isolation, is not as serious as some other sex crimes. That much follows from the legislature's classification of that offense. The legislature has classified public indecency as a misdemeanor unless the defendant previously has been convicted of public indecency or another specified

sex crime, in which case the offense is classified as a Class C felony. ORS 163.465(2). This is not a case, however, in which defendant's criminal history consists of a single conviction for public indecency, nor is this a case in which the three convictions that resulted in a presumptive life sentence under ORS 137.719(1) are three felony public indecency convictions. Rather, this is a case in which defendant, over a 30-year period, has been convicted of sexual abuse and sodomy of his own and other people's children, as well as public indecency. And many of the charged and uncharged instances in which defendant has engaged in public indecency during that 30-year period have been directed at or related to children. Indeed, defendant's most recent conviction for public indecency occurred approximately 150 feet from a middle school, and the woman who reported his behavior to the police told the officer that there were children walking in the area.

This is not one of those rare instances in which the enhanced sentence that the legislature authorized for a repeat offender is constitutionally disproportionate to the offender's criminal history. *See Wheeler*, 343 Or at 671-72 (recognizing legislature's primary role in setting punishments for repeat offenders). Rather, as the record in this case reveals, defendant's most recent conviction for public indecency reflects a deeply ingrained pattern of predatory behavior that has persisted since 1982 when he was first convicted for sexually abusing his eight-year-old daughter. Given the seriousness of defendant's repeated sexual misconduct and the danger that it forecasts for others, we cannot say that imposing a presumptive life sentence in response to defendant's pattern of criminal behavior violated Article I, section 16. *Cf. Jensen*, 231 Or at 145-46 (upholding a life sentence imposed as a result of two sex offenses: contributing to the delinquency of a minor followed by public indecency).

Defendant makes two additional arguments regarding the severity of the sentence and the gravity of the offense, which we discuss briefly. First, defendant notes that the sentence in *Jensen* was life with the possibility of parole while the sentence in this case is life without the possibility of parole. However, as this court explained in *Tuel*, an inability to reform one's conduct despite repeated opportunities to do so—an inability that the record in this case

amply demonstrates—can justify the legislature's decision to impose a life sentence without the possibility of parole. *See Tuel*, 234 Or at 7 (upholding life sentence without possibility of parole as applied to a four-time offender). We are not persuaded that, on these facts, the absence of the possibility of parole makes defendant's life sentence unconstitutionally disproportionate, as applied.

Second, defendant notes that the life sentence that he received under ORS 137.719(1) substantially exceeds the guidelines sentence that he would have received for his 2011 conviction for public indecency. Relying on *Wheeler*, he argues that the difference between the two sentences is significant. Specifically, he contends that, the greater the difference between the two sentences, the more likely it is that his sentence under the repeat offender statute is disproportionate in violation of Article I, section 16. In our view, defendant reads too much into *Wheeler*.

The defendant in *Wheeler* previously had been convicted of two felony sex offenses. His third conviction resulted from 18 separate felony sex offenses that involved three children. 343 Or at 677. As a result of the third conviction, the trial court imposed a presumptive life sentence on the defendant pursuant to ORS 137.719(1). In holding that that sentence was constitutional, as applied, this court noted that the defendant could have received a guidelines sentence of 111 years in prison if the trial court had imposed guidelines sentences consecutively on each of his 18 offenses. *Id.* at 677-78. Given that fact, the court observed that it was difficult for the defendant to argue that a life sentence imposed pursuant to ORS 137.719(1) "would 'shock' anyone's moral sense." *Id.* at 679.

Although *Wheeler* found the comparison between the two sentences instructive in that case, we do not understand the court to have either held or suggested that a repeat offender sentence will be constitutionally proportionate under Article I, section 16, only if the guidelines sentence for the current crime is effectively the same as the sentence imposed under the repeat offender statute. Similarly, *Wheeler* does not support the proposition that defendant urges us to draw from that decision—that, the greater the

disparity between the two sentences, the more likely it is that the repeat offender sentence is constitutionally disproportionate. Indeed, that proposition would focus primarily on the gravity of a defendant's last offense—the one that triggered the imposition of a repeat offender sentence—in determining the constitutionality of the sentence. However, as this court has long recognized, an analysis of the constitutionality of a defendant's repeat offender sentence "must focus not only on the latest crime and its penalty, but on the defendant's criminal history." *Wheeler*, 343 Or at 673; *see Jensen*, 231 Or at 142, 144-45 (focusing on defendant's criminal history, not his conviction for public indecency, in deciding constitutionality of repeat offender sentence); *Smith*, 128 Or at 525-26 (following same principle).

This is not to say that the sentence that a defendant would have received for the offense that triggered the imposition of a repeat-offender sentence has no bearing on the proportionality analysis. It reflects the legislature's judgment regarding the gravity of that single offense. However, our cases have held that what matters in determining the constitutionality of a repeat-offender sentence is the gravity of a defendant's criminal history. Given defendant's criminal history, we conclude that the life sentence that the trial court imposed is not unconstitutional, as applied.

b.   *Comparison of the penalties for related offenses*

We also consider the second factor that the court noted in *Rodriguez/Buck*—a comparison of the penalties imposed for related offenses. *See Rodriguez/Buck*, 374 Or at 63-65 (discussing that factor). However, as the court cautioned in *Rodriguez/Buck*, courts must be careful in assessing whether one offense is more serious than another. *Id.* at 64. The legislature is primarily responsible for ranking the severity of offenses, and it "may decide that certain crimes should henceforth be considered more serious and subject to more severe penalties than other crimes that previously had been considered more serious." *Id.* With that caution in mind, we turn to the three comparative arguments that defendant makes here.

Defendant argues initially that the mix of convictions that can give rise to a presumptive life sentence under

ORS 137.719(1) results in disproportionate sentences in violation of Article I, section 16. Relying on *Rodriguez/Buck*, he argues that three relatively low-level sex crimes can give rise to the same presumptive life sentence under ORS 137.719(1) as three far more serious sex crimes. He contends that the court found a similar disparity constitutionally significant in *Rodriguez/Buck*.

Defendant's initial argument is problematic for at least two reasons. First, as explained above, the life sentence that the trial court imposed in this case is not disproportionate in light of defendant's particular criminal history. If defendant's sentence is proportionate to his criminal history, it is difficult to see how it advances his as-applied challenge to argue that other defendants with less serious criminal histories might be able to raise successful as-applied challenges to their sentences. *Cf. Harmelin v. Michigan*, 501 US 957, 1005, 111 S Ct 2680, 115 L Ed 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (comparative analysis of related crimes primarily helpful when threshold comparison between crime committed and sentence imposed leads to inference that sentence is constitutionally disproportionate).

Beyond that, as we understand defendant's argument, it partakes more of a facial than an as-applied challenge. He contends that ORS 137.719(1) is similar to the statute at issue in *Rodriguez/Buck* in that it imposes the same sentence for markedly different criminal conduct. However, unlike the statute at issue in *Rodriguez/Buck*, ORS 137.719(1) does not require the same life sentence no matter how disparate the combination of convictions that gives rise to a repeat-offender sentence under that statute. Rather, ORS 137.719(1) authorizes only a presumptive life sentence. A trial court may impose a downward departure sentence under ORS 137.719(2) for less egregious combinations of offenses. The facial disparity on which defendant's argument appears to rely is absent here.[11]

---

[11] If a trial court imposes a life sentence under ORS 137.719(1) that is not constitutionally proportionate to a defendant's criminal history, the defendant can always raise that constitutional issue on appeal, and the appellate courts can correct it.

Defendant raises a second comparative argument. He notes that ORS 137.690 requires a 25-year mandatory minimum sentence for a defendant's second "major felony sex crime."[12] He argues that, under ORS 137.719(1), a person who has four convictions for public indecency is subject to life imprisonment without the possibility of parole while, under ORS 137.690, "a person who commits two brutal rapes would only be subject to a mandatory sentence of 25 years in prison." Defendant's argument appears to be more of a facial challenge than an as-applied challenge. Viewed that way, it does not advance his position. ORS 137.690 provides a mandatory *minimum* sentence while a ORS 137.719 provides a presumptive *maximum* sentence. There is nothing inconsistent or disproportionate in saying that two major felony sex crimes will result in a minimum sentence of 25 years, *see* ORS 137.690, while three felony sex crimes can result in a maximum sentence of life imprisonment without the possibility of parole, *see* ORS 137.719.[13]

Defendant raises a third comparative argument. He contends that the list of felony sex offenses that will give rise to a presumptive life sentence under ORS 137.719(1) omits some misdemeanor and felony sex crimes that, in his view, are as serious as the felonies included in the list. It follows, he reasons, that the absence of those offenses from the list of felony sex crimes that will give rise to a presumptive life sentence under ORS 137.719(1) renders his sentence disproportionate.

Defendant's third argument is problematic for the same reason that his first argument is. If, as explained

---

[12] ORS 137.690(b) defines "major felony sex crime" as first-degree rape, first-degree sodomy, first-degree unlawful sexual penetration, and using a child in a display of sexually explicit conduct.

[13] It may be that defendant is arguing that the guidelines sentence for two convictions for felony public indecency is substantially less than the 25-year minimum sentence under ORS 137.690 for two convictions for "major felony sex crimes." To the extent that is defendant's point, the difference reflects the legislature's judgment that two convictions for felony public indecency are not as serious as two convictions for "major felony sex crimes." However, we fail to see how that comparison advances defendant's as-applied argument. It does not explain why a life sentence is unconstitutionally disproportionate, as applied to defendant's criminal history, which is not limited to convictions for public indecency but also includes sexual abuse and sodomy of children.

above, defendant's sentence is constitutionally proportionate as applied to his criminal history, it is difficult to see how it advances his as-applied challenge to his sentence to argue that the legislature also could have imposed a life sentence on others who commit additional sex crimes. *See Harmelin*, 501 US at 1005 (Kennedy, J., concurring in part and concurring in the judgment) (reasoning that comparison of related offenses is less helpful when sentence appears proportionate to crime). Beyond that, defendant's argument assumes a proposition that this court has never suggested—that there must be a perfect proportionality among the sentences for all related offenses before an individual sentence will be proportioned to the offense within the meaning of Article I, section 16. When, as explained above, defendant's sentence appears proportionate to his particular criminal history, the comparisons that defendant invites us to make provide no reason to hold that a life sentence, as applied to him, is disproportionate in violation of Article I, section 16.

## 2.  *Eighth Amendment*

Defendant argues that, as applied to him, a sentence of life imprisonment without the possibility of parole violates the Eighth Amendment's prohibition against cruel and unusual punishment. Justice O'Connor explained in *Ewing v. California*, 538 US 11, 123 S Ct 1179, 155 L Ed 2d 108 (2003), that the "'Eighth Amendment does not require strict proportionality between crime and sentence[,]'" but "'forbids only extreme sentences that are "grossly disproportionate" to the crime.'" *Id.* at 23 (plurality opinion) (quoting *Harmelin*, 501 US at 1001 (Kennedy, J., concurring in part and concurring in the judgment)).[14]

To determine whether a sentence is grossly disproportionate to a crime, the inquiry starts "by comparing the gravity of the offense and the severity of the sentence." *Graham v. Florida*, 560 US 48, 60, 130 S Ct 2011, 176 L Ed

---

[14] Justice Thomas and Justice Scalia concurred in the judgment in *Ewing*. *See* 538 US at 31-32 (Scalia, J., concurring in the judgment); *id.* at 32 (Thomas, J., concurring in the judgment). Because Justice O'Connor's plurality opinion represents the narrowest ground on which the judgment rests, her opinion controls our application of the Eighth Amendment. *See Marks v. United States*, 430 US 188, 193, 97 S Ct 990, 51 L Ed 2d 260 (1977) (explaining which opinion controls when no opinion commands a majority).

2d 825 (2010). Of importance here, determining the "gravity" of a given offense in the context of a sentence imposed under a recidivist statute includes consideration of the defendant's criminal history. *See Ewing*, 538 US at 17-20 (plurality opinion) (recounting defendant's criminal history); *id.* at 29 (plurality opinion) (examining defendant's criminal history in context of evaluating sentence imposed under California's "three-strikes" law). Applying the principles stated in the plurality opinion in *Ewing*, we conclude that defendant's sentence does not violate the Eighth Amendment's prohibition against cruel and unusual punishment for the same reason that it does not violate the requirement in Article I, section 16, that punishment should be proportioned to the offense.

		The decision of the Court of Appeals and the judgment of the circuit court are affirmed.