Garrett, J., dissenting.
In this case we are asked to determine if the imposition of multiple 25-year terms of incarceration for violation of ORS 163.670, using a child in a display of sexually explicit conduct, for actions best described as "sexting," is constitutionally disproportionate as applied to this defendant. That is, does it shock the moral sense of reasonable people to impose that penalty, for this defendant, for these acts. Like the majority, I conclude that it does and join in that opinion. I write separately, however, to discuss the history behind the statutes at issue in this case and how that history requires that we approach this case in a slightly different manner than previous proportionality challenges.
As I will discuss, an examination of the historical evolution of the statutes at issue in this case evidences that the legislature has never set about, deliberately, to criminalize the behavior that underlies defendant's convictions under ORS 163.670. Further, the voters of Oregon were repeatedly assured that the 25-year penalty created by Measure 73, codified in ORS 137.690, would not be applied to sexting and that insinuations to the contrary were a "phantom issue." What is more, the proponents of Measure 73 indicated that the imposition of such a penalty, to acts such as defendant's, would violate constitutional proportionality. Thus, as I explain below, this case presents the rare occurrence where the normal and entirely appropriate judicial hesitancy to wade into proportionality and supplant a presumed legislative judgment that a particular penalty is proportioned to an offense is nonexistent. Far from the norm, the voters who approved ORS 137.690 understood (wrongly or rightly) that the courts, through application of the proportionality clause of Article I, section 16, of the Oregon Constitution, would operate as a safety valve, preventing the application of the sentencing statute to acts such as defendant's. Given that, I conclude that the imposition of a 25-year sentence for teenage sexting is constitutionally disproportionate. I, therefore, respectfully concur.
*645 I. BACKGROUND
A. Proportionality and Legislative Purpose
It is unquestionably the role of the legislature to declare which acts are so offensive to society that they should be criminalized and to accordingly affix a penalty. State v. Smith , 128 Or. 515, 524, 273 P. 323 (1929) ("The power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power, controlled only by the provisions of the Constitution."). However, Article I, section 16, which provides, in part, that "all penalties shall be proportioned to the offense," imposes on the legislature the constitutional obligation to proportion the sentences it enacts. Thus, although the legislature sets criminal penalties, it cannot do so arbitrarily. Rather, Article I, section 16, requires that it consciously and deliberately engage in a proportioning-investing each legislatively enacted sentence with a rational basis.[1]
If the legislature fails in this constitutional obligation, either by (a) failing to engage in its obligation to proportion at the outset, or by (b) enacting a sentence beyond the limits of what Article I, section 16, permits, only then does a court step in. For it is the role of the courts to interpret, and give effect to, constitutional provisions. "The requirement that we give effect to the words of an enactment is doubly applicable when the law in question is a constitutional [provision]."
*119 Northwest Natural Gas Co. v. Frank , 293 Or. 374, 381, 648 P.2d 1284 (1982). In the first instance, when the legislature fails to engage in proportioning, it falls to the courts to fill that role. In the second, when, despite legislative proportioning, the enacted sentence falls outside what Article I, section 16, permits, it becomes the constitutional obligation of the courts "to enforce this provision of the Bill of Rights, and avoid the judgment so far as it is excessive[,]" even when a sentence is "within the maximum of the statute." State v. Ross , 55 Or. 450, 474, 104 P. 596 (1909), modified on reh'g , 55 Or. 450, 106 P. 1022 (1910), overruled on other grounds by State v. Hanna , 224 Or. 588, 356 P.2d 1046 (1960).
*646 A proportionality inquiry under Article I, section 16, whether framed as a facial challenge or an as-applied challenge, asks if the imposition of the sentence would "shock the moral sense" of reasonable people "as to what is right and proper under the circumstances." Sustar v. County Court for Marion Co. , 101 Or. 657, 665, 201 P. 445 (1921). In State v. Wheeler , the Oregon Supreme Court clarified that Article I, section 16, requires "that the penalty imposed on a criminal defendant be 'proportioned' to the specific offense for which the defendant was convicted-that it bear the appropriate 'comparative relation' to the severity of that crime." 343 Or. 652, 667, 175 P.3d 438 (2007).
Over time, Oregon has developed a nonexhaustive framework to guide courts in determining when a sentence is disproportionate under Article I, section 16. See, e.g. , State v. Rodriguez/Buck , 347 Or. 46, 58, 217 P.3d 659 (2009) (describing "at least three factors that bear upon that ultimate conclusion: (1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant"). That framework has been further developed in cases involving recidivist sentencing schemes. See, e.g. , State v. Althouse , 359 Or. 668, 686, 375 P.3d 475 (2016) (noting that a court will "consider the specific circumstances of the charged and uncharged offenses that make up [a defendant's] criminal history in assessing [proportionality for recidivist sentences]"). It has also been clarified to take account of intellectual disability. See, e.g. , State v. Ryan , 361 Or. 602, 620-21, 396 P.3d 867 (2017) ("Evidence of an offender's intellectual disability[,]" if credited, "is relevant to a proportionality determination where sentencing laws require the imposition of a term of imprisonment without consideration of such evidence.").
At its core, all of Oregon's Article I, section 16, jurisprudence is an attempt to guide courts in navigating the constitutionally imposed tension between the legislative and judicial branches that the "check and balance" mechanism of Article I, section 16, creates. Because of this, the essential predicate inquiry for all proportionality analyses *647 is the search for legislative purpose.[2] As William Blackstone noted, proportionality must be judged in the context of "the particular purpose [the legislative sentencing law] is meant to serve, and by no means exceed it[.]" 4 William Blackstone, Commentaries on the Laws of England 12 (1769). The Oregon Supreme Court has also noted that early American constitutions similarly framed proportionality in the context of legislative purpose:
"No wise legislature will affix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason; where the same undistinguishing severity is exerted against all offences[,] the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do those of the lightest dye: For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate, mankind."
Wheeler , 343 Or. at 663, 175 P.3d 438 (citing NH Const., Part I, Art. XVIII (1784) and noting that "[o]f all the state constitutions from that period, we think the New Hampshire Constitution of 1784 provided the most *120 lucid explanation of the rationale for its provision requiring proportional sentencing").
In addition, the Oregon Supreme Court explained:
"[I]mplicit in the court's analysis is the conclusion that the legislature (and the people, acting through the initiative process) has broad authority to determine which crimes are 'greater' and therefore deserving of greater penalties, as long as there is some reasonable basis for that decision * * *. This court thus ensures that constitutional standards are met; however, respect for the separation of powers and the legislature's authority to set criminal penalties means that the court's role is a limited one."
Wheeler , 343 Or. at 671-72, 175 P.3d 438. Proportionality analysis therefore begins with a search for the rational basis of the legislative action.
*648 Jensen v. Gladden , 231 Or. 141, 146, 372 P.2d 183 (1962) ("It is the province of the legislature to establish the penalties for the violation of the various criminal statutes and if the penalties are founded upon an arguably rational basis we have no authority to hold that they are invalid."); see also State v. Isom , 313 Or. 391, 400, 837 P.2d 491 (1992) ("The legislature has chosen to subject all such persons to the maximum potential penalty. Defendant's opinion makes sense, but so does that which we attribute to the legislature. There was a rational basis for the legislature to conclude that both classes of escapees are dangerous.").[3]
An inquiry into legislative purpose-the search for the rational legislative basis behind the penalty-is not an optional addendum to the analysis. Rather, that necessary inquiry sets the guideposts for whether a sentence shocks the conscience under Sustar :
"Second, and relatedly, we view this court's consideration of whether the legislature's imposition of a particular penalty (or range of penalties) for an offense had a 'reasonable' or 'an arguably rational basis' ( Jensen ) or a 'rational basis' ( Isom ) as an effort to apply the Sustar test, rather than as establishing an alternative test. Put differently, in those cases, the court did not abandon the 'moral shock' test-indeed, both quoted that test-but rather looked to the legislative enactment of the particular penalties at issue as an external source of law to assist in determining whether those penalties would shock the moral sense of reasonable people."
Wheeler , 343 Or. at 670-71, 175 P.3d 438.
The need to look to the purpose behind the legislative enactment as an external guidepost exists whether the challenge is facial, or as-applied, as in this case. An as-applied challenge merely permits a court to "consider, among other things, the specific circumstances and facts *649 of the defendant's conduct that come within the statutory definition of the offense, as well as other case-specific factors, such as characteristics of the defendant and the victim." Rodriguez/Buck , 347 Or. at 62, 217 P.3d 659. In doing so, the court is considering the characteristics of this defendant against the hypothetical defendant that motivated the legislative action.
In this case, therefore, before we can appropriately delve into the characteristics of this defendant, or the circumstances of these crimes, and place those within the context of a Rodriguez/Buck / Althouse / Ryan framework, we must first look to the history of the statutes at play, and ask whether the legislature engaged in its constitutionally obligated duty under Article I, section 16, to proportion the sentences it enacts. For this case, that includes two statutes. ORS 163.670, enacted by the legislature, creates the crime of using a child in a display of sexually explicit conduct. ORS 137.690, passed by the voters as part of Measure 73, imposes a mandatory 300-month sentence for "[a]ny person who is convicted of a major felony sex crime, who has one (or more) previous conviction of a major felony crime." Among the offenses classified by that statute as a "major felony *121 sex crime" is using a child in a display of sexually explicit conduct. ORS 137.690(b). Because our ultimate aim is to assess proportionality by comparing the legislative purpose motivating the sentence to the circumstances of this defendant, before discussing legislative history it is helpful to first define the conduct at the heart of this defendant's prosecution under ORS 163.670 : sexting.
B. Sexting
The Merriam-Webster Dictionary added the word "selfie" to its print and online dictionaries in 2014, along with the words "hashtag," "unfriend," "social networking," "catfish," and "big data." Peter Sokolowski, Editor-at-Large, for Merriam-Webster, characterized the new words of 2014 as showing "the impact of online connectivity to our lives and livelihoods" and "the growing influence technology is having on human endeavor * * * * * [particularly,] illustrating how technology is being used to understand and motivate behavior." Press Release, Peter Sokolowski, Editor-at-Large, *650 Merriam-Webster's Collegiate Dictionary Updated for 2014 (May 19, 2014), http://www.digitaljournal.com/pr/1926343 (accessed Aug. 29, 2018). He explained that "selfie , and hashtag refer to the ways we communicate and share as individuals." Id. (emphases in original).
In 2014, Merriam-Webster officially defined selfie as "an image of oneself taken by oneself using a digital camera especially for posting on social networks"; colloquially, "a picture that you take of yourself especially by using the camera on your smartphone." Merriam-Webster.com , https://www.merriam-webster.com/dictionary/selfie (accessed Aug. 29, 2018). To take a selfie is to document a fleeting moment of one's public, or private, life. Turning the lens on ourselves is not a novel concept, however, technology has created new categories, new opportunities, and new modes of self-expression, including the selfie. And not all selfies are created equal. Many researchers and teen magazine readers alike agree that there are vast subcategories of selfies.[4] When the selfie taker strikes a pose with an exaggerated lip pout, it is referred to as a "duck face selfie." Also popular is when the selfie taker directs the lens towards their feet to show the viewers that the selfie taker is traveling or visiting an exotic locale; this selfie is sometimes referred to as a "beach feet brag selfie."[5] There is also the "bathroom selfie," the "bedroom selfie," the "I eat, therefore I am selfie," and the "gym selfie"-all modes of self-portrait meant to show viewers where the selfie taker is or what the selfie taker is doing. Yet, selfies are also used to express self-portraiture in a quasi-autobiographical, quasi-self-publicity fashion according to researchers.[6] Selfies of this nature include the "abs selfie" and the "booty selfie." Needless to say, this is far *651 from an exhaustive list of the ever-evolving world of selfie subcategories.
To take a selfie is to capture an image of one's self, and when the selfie taker sends or shares that image with someone else, it is an act of social engagement. "[T]o send someone a sexually explicit message or image by cell phone" is "to engage in sexting" or to send a "sext." Merriam-Webster.com , https://www.merriam-webster.com/dictionary/sext (accessed Aug. 29, 2018). Taking selfies and sending those self-created images through sext is a new, radical form of social interaction and courting.
Various research studies place the rates of sexting among teenagers and young adults from 15 percent up to over 30 percent. See, e.g. , Dake et al ., Prevalence and Correlates of *122 Sexting Behaviour in Adolescents , 7 Am. J. Sexuality Educ., 1, 1-15 (2012) ("Overall, 17% of students engaged in sexting, which varied significantly by age (3% of 12-year-olds to 32% of 18-year-olds)."); Madigan et al ., Prevalence of Multiple Forms of Sexting Behavior Among Youth: A Systematic Review and Meta-analysis , 3 JAMA Pediatr. 172, 327-35 (2018) (finding the highest rate for sending and receiving sexts at 27.4 percent).
In sum, sexting as a social activity is defined by two essential components. First, the picture is not typically taken by someone else, rather it is taken by the individual appearing in the image. It is self-created; aptly called a "selfie." Second, the image generally does not come into the possession of another through nefarious acquisition or capture, but rather through receipt. A person is in receipt of a sexted message because the person depicted in the image voluntarily sent it, either upon their own initiative or in response to a noncoercive request, and intended it to be possessed by a specific person.[7]
C. ORS 163.670
Turning now to the first of the two statutes of interest in this case, ORS 163.670 describes the crime of using a child in a display of sexually explicit conduct:
*652 "(1) A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording.
"(2) Using a child in a display of sexually explicit conduct is a Class A felony."
The above is the most recent iteration of ORS 163.670 ; however, the prohibition against child pornography, or the crime of using a child in a sexually explicit display, was originally codified in 1985. The legislative history makes clear that the type of modern day conduct, quotidian and habitual among many young people-the act of taking a selfie and sexting it to someone else via cellular phone-was not then, nor in any subsequent revisiting of the law (in 1987, 1991, and 2011), contemplated by lawmakers in Oregon. While sexting now unquestionably falls under the wording of the statute, it is not by deliberate legislative design, but rather through the interplay of broad statutory language and social and technological evolution. The history of each relevant legislative change is broken out by date, in chronological order, below.
1. 1985-Enactment of ORS 163.670
In April of 1985, Senator Tony Meeker introduced Senate Bill (S.B.) 375 to the members of the Senate Judiciary Committee, describing the dire circumstances that prompted the sponsors of the bill to action:
"It has been estimated * * * that the international trafficking in child pornography is somewhere between five and six billion dollars a year. An international network of child pornographers and molesters promote such activities as packaged child sex tours and auctions, auctions where children, not printed material, were sold. Now most people are understanding of the physical and psychological damage that can be done to young boys and girls who are sexually exploited in this way. * * * Child pornography has emerged as a key feature in society's heightened concern about the sexual molestation of children. * * * Experts say there is a definite connection between child sexual abuse and child prostitution as well as child pornography. * * * Senate Bill 375 would put some teeth into existing Oregon law. It would *653 revise the age of child protection from 16 to 18. Under [proposed Senate Bill 375], a person is considered incapable of consenting to a sexual act if he is under 18 years of age. It would also remove the requirement that the material meet the legal definition of obscene and provide heavy fines and prison terms for those convicted. Our efforts to prevent crimes against children have not been adequate. There has been an urgent demand by Americans, by Oregonians, from all walks *123 of life, that the problem of missing and sexually exploited children in this country, in this state, must be confronted."
Tape Recording, Senate Judiciary Committee, S.B. 375, Apr. 25, 1985, Tape 110, Side A (statement of Sen. Tony Meeker).
In Senator Meeker's written testimony to the committee, he further detailed the current state of affairs that prompted his action:
"The problem of missing and abused children in this country and in this state should be at the top of our list of concerns as legislators-as human beings! It is estimated that at least 1,500,000 children are missing from their homes each year-many end up sexually abused or even murder victims. Many are simply never seen again. Oregon's child abuse statistics, particularly those for sexual abuse, skyrocketed last year for the fourth time this decade.
"The United States Congress has acknowledged this problem by passing the Missing Children Act in 1984 and a National Center for Missing and Exploited Children has also been established. While these federal activities are a positive step in helping sexually abused and exploited children, much more can be done at the state level. Comprehensive state legislation is critically needed to help solve this problem. This is not a partisan issue-laws to protect children should transcend party affiliation.
"It is a tragic reality that there are those people in our society who seek out children to gratify their sick sexual fantasies. An inextricable connection exists between child pornography and child sexual abuse-each photo represents the actual molestation of a child and these photos are circulated, distributed-either purchased or traded among other pedophiles, inciting them to commit still more crimes against innocent children."
*654 Testimony, Senate Judiciary Committee, S.B. 375, Apr. 25, 1985, Ex. K (statement of Sen. Tony Meeker) (underscoring in original).
Experts in the field of law enforcement and victim advocacy testified in support of S.B. 375 and shared their experiences in the field in an effort to illustrate the conduct they envisaged S.B. 375 would eradicate. Testifying in support of S.B. 375, Sergeant Robert Walliker, on behalf of the Portland Police Bureau, explained:
"Parents, imagine for a moment your young son or daughter at school recess-innocent, trusting, unsuspecting. Suddenly a male adult stranger appears offering candy. He lures your child to a secluded spot, coerces them to remove their clothing and, taking care not to touch the child, takes several photos-then leaves. After school your child tells you what happened.
"You call the police. The responding officer states this is the third report of the same incident this month. A week later a detective tells you the man has been caught in the act, with his pockets full of lewd photos of children including the photos of your child. But, the detective explains, what this man did is not against the law in Oregon, the District Attorney cannot prosecute and a judge orders all photos, including those of your child, returned to the suspect. Some years ago this same situation occurred in Multnomah County. The suspect, identified in over 11 cases, was never prosecuted.
"This man was a pedophile-a person who uses children for purposes of his own sexual gratification.
"As sergeant of the Multnomah County Sheriff's Sex Crimes Detail during the past ten years, I have been involved in investigating close to 3,000 cases of child molest. I have noticed a definite increase in the use of photography by pedophiles to document and fantasize about their crimes. Search warrants, executed upon such suspects' homes, usually result in the seizure of such materials.
"* * * * *
"I submit to you that child pornography is a problem in Oregon and we need a law against it. Many other states, such as Washington and California have these laws, which are effective tools for law enforcement. Investigative techniques have been developed which quickly locate and *655 identify pedophiles, apprehend and *124 prosecute them, with a very high conviction rate.
"The opposition to the passage of this law during the last legislature resulted in the bill being tabled. The opposition argues that despite the offensiveness of child pornography, it is still protected under the Constitution's First Amendment, freedom of speech. Opponents of this legislation keep referring to it as a 'pornography issue.' However, 'kiddie porn' is not pornography, but it is the photographic reproduction of a sex crime (usually a felony) perpetrated upon a helpless child victim. I do not believe Thomas Jefferson went to all that trouble to allow persons to be able to make a photographic record of an actual crime committed against a child."
Testimony, Senate Judiciary Committee, S.B. 375, Apr. 25, 1985, Ex. O (statement of Sergeant Robert Walliker).
Similarly, Dottie Belknap, Legislative Chairperson for the Multnomah County Child Abuse Coalition, testified:
"Child pornography may be the nation's least understood crime. It represents a sexual abuse where there is an imbalance in age, size, power or knowledge. Children are simply not able to give informed consent, and as victims, are hostages to the vulnerability of childhood.
"The pornographer sees nothing wrong with gratifying himself at the children's expense. And yet, it is a psychological violence of the worst kind. Pornographers do hurt children, sometimes physically and almost always in spirit. It is a crime almost always suffered in silence and shrouded in such fear that the child pornographers continue for years or a lifetime without being apprehended.
"Experts say there is a connection between child sexual abuse and child prostitution and between child prostitution and child pornography.
"* * * * *
"The dead cannot talk about their experiences and most survivors will not. Victims are shocked into silence. But, even though most children do not talk about their experience, they are usually haunted by it the rest of their lives.
"S.B. 375 encourages a solution to this hidden epidemic, one in which children are cruelly forced to take part in vile *656 acts. The Coalition recognizes child pornography as a vile crime against defenseless children."
Testimony, Senate Judiciary Committee, S.B. 375, Apr. 25, 1985, Ex. P. (statement of Dottie Belknap).
The Senate Judiciary Committee met to further discuss S.B. 375 and the age of consent on May 21, 1985. Margaret J. Nightingale, Staff Attorney for Oregon Legal Service's Juvenile Rights Project, explained:
"The problem of children being forced or led into pornography and prostitution is serious and of major proportions. Some children are coerced into these activities at home by their own parents. Unless emancipated by court order (a rare event), children must legally remain at home until age 18. Thus, 16- and 17-year olds can constitute a 'captive population' unless and until abuse is detected and the child is removed from the home. Other children are abused at home in other ways, physical, sexual or emotional, and develop so little self-esteem that when at age 16 or 17 they leave home as runaways or are forced out as throwaways, they are very easily led to sell their bodies as a way to survive on the streets.
"Arresting and punishing the persons who use or promote children in sexual performances is one method of reducing these activities and protecting these children. S.B. 375 appropriately extends this method to cover persons who use or promote 16- and 17-year olds."
Testimony, Senate Judiciary Committee, S.B. 375, Apr. 25, 1985, Ex. Z (statement of Margaret J. Nightingale).
As the above testimony makes clear, proponents and supporters of S.B. 375 were first and foremost concerned about child sexual exploitation in connection with the crimes of sexual abuse, sexual molestation, child prostitution, and missing children. S.B. 375 sought to criminalize and heavily penalize the manufacture of child pornography, squarely envisioning images taken by adults of children *125 against their will, as the result of coercion, or without their knowledge.
2. 1987-Modification of ORS 163.670
The following session, the legislature again took up the issue of children and pornography by request of *657 the Oregon Child Protection Task Force. Senate Bill 364 was introduced on May 13, 1987 by cosponsor Senator Jim Simmons during a hearing before the Senate Committee on Judiciary. Committee co-counsel Mark Kramer prepared a preliminary analysis of S.B. 364 and explained:
"Problem addressed. Current law in this area prohibits:
"1. The use of children in the production of pornography;
"2. The sale or exhibition of child pornography for 'anything of value'; and
"3. Paying for observing or obtaining child pornography which is produced in violation of Oregon or federal laws.
"* * * * *
"Law enforcement officials seek greater enforcement tools. Under current law they cannot take action against those who simply possess child pornography and those who give away or trade those materials. Such officials contend that enforcement under current law is frustrated by their inability to prove the source of the materials or the fact that it was obtained 'for value.' "
Exhibit W, Senate Committee on Judiciary, S.B. 364, May 13, 1987 (accompanying statement of committee co-counsel Mark Kramer).
Committee co-counsel Kramer explained that the current child pornography laws, enacted in 1985, had yet to be tested by any court case. Proponents of S.B. 364 complained that, according to Kramer, the 1985 law was too difficult to enforce and did not go far enough. Particularly, according to Senator Simmons' prepared materials, the "of value" requirement in the 1985 law prevented the prosecution of those people who shared or distributed child pornography to promote "deviant beliefs" without receiving anything in return for the materials. Assistant United States Attorney, Jim Collins, testified before the committee:
"[JIM COLLINS]: The production of child pornography is the abuse of a child. It's the abuse of a child when the photo was taken, it is the abuse of a child any time and every time that that photo is transmitted to someone else.
"* * * * *
*658 "[SENATOR SIMMONS]: This is what we are talking about. Children. Young children. Exploited. Abused. Photographed so that the abuse is compounded. I would urge the adoption of Senate Bill 364 to at least put a dent in what's going on."
Tape Recording, Senate Committee on Judiciary, S.B. 364, May 13, 1987, Tape 142, Side A (statements of Assistant U. S. Attorney Jim Collins and Sen. Jim Simmons).
Again, experts with experience on the ground in the fields of law enforcement and victim advocacy testified in support of S.B. 364. Bonnie Glover Griswold, a probation officer and member of the Oregon Child Protection Task Force-the entity that requested a second look at child pornography laws in Oregon-explained:
"These photographs are a history of an abuse and evidence of a crime. A picture of this nature cannot be taken without a child being sexually exploited. Offenders use these photographs repeatedly. They recall to the offender the abusive event. It feeds their deviant fantasies and their distorted thinking. This use becomes a further abuse of the victim. The photographs are the grossest example of the offender's thinking and his activity. The child victim is no longer a human being to the offender. They become objects to be used and abused by the offender. I have seen pictures of victims from the ages of a few months to late adolescence, boys as well as girls. The victims may be related to the offender or the victim may know the offender as a family acquaintance, friend, or neighbor. Whatever the circumstances, the offender is able to groom the victim and set up the situation where an offense takes place.
*126 "Over the past three years I have learned that sex offenders do use sexually explicit material in their offender cycle. Child molesters, especially those who are pedophiles, are very likely to keep photographic histories of the individual victims as well as the individual events of abuse to a victim. Their collection of material will also include commercially made magazines, newspapers and videos. They may also make their own material by combining sexually explicit material with pictures of their victims or pictures of children they know or have cut out of commercial publications.
"With the passage of this bill, Oregonians will be better able to protect their children. Children of all ages and *659 backgrounds can be exploited. They need your protection. Failing to pass this bill can only result in further victimization of our children."
Testimony, Senate Committee on Judiciary, S.B. 364, May 13, 1987, Ex. D (statement of Officer Bonnie Glover Griswold).
In addition, Deputy Chief Rob H. Aichele of the Investigations Branch of the Portland Bureau of Police, testified in support of S.B. 364 and explained:
"Any child pornography is evidence that a child has been sexually abused. One of the arguments against this measure is that some of the material may have been produced in a country where sex abuse is legal. This argument is no more persuasive than it would be if a similar argument were asserted with respect to the importation of illegal narcotics that had been legally manufactured in another country. Allowing this material to circulate in the child pornography underground is tacit approval of the sexual exploitation of children. We cannot condone nor support this exploitation, no matter where it occurs.
"The people in the criminal justice system that work with pedophiles have substantiated that sexually explicit child pornography is frequently a part of the offenders 'program of arousal.' This program is the offender's process by which they become aroused, and advance the desire to violate a child. This 'program' is a usual precursor to child sexual assaults.
"I urge your support of S.B. 364 as a tool to break the horrible chain of child pornography. This chain is linked by the initial violation of a child, linked by arousing an offender, and then linked to further sex abuse. The concepts proposed by S.B. 364 need to be put into law."
Testimony, Senate Committee on Judiciary, S.B. 364, May 13, 1987, Ex. E (statement of Deputy Chief Rob H. Aichele).
3. 1991-Modification of ORS 163.670
During the 1991 session, the legislature again took up the issue of child pornography. In House Bill (H.B.) 2681, which similarly mirrored efforts in 1985 and 1987, the emphasis focused on the deviance of pedophiles and the exploitation of children through the dissemination and possession of child pornography. Like its predecessor bills, H.B.
*660 2681 attempted to capture persons in possession of child pornography, as a crime separate and apart from the crimes of producing or distributing child pornography. Senator Larry Hill explained to his colleagues at the House Committee on Judiciary hearing on March 8, 1991:
"We can prohibit possession of child pornography provided it is in pursuit of the state's compelling interest to protect the victims.
"* * * * *
"The state's compelling interest allows us to regulate this form of speech, which otherwise would be considered protected under Oregon's constitutional free speech provision as well as the federal provision for free speech. The Supreme Court in a recent case last year said that states may regulate possession because it was furthering the protection of the individual victim.
"* * * * *
"We have a compelling interest to protect the child victim. * * * It's important to make the record clear that this is to protect the victims of sexual abuse, child victims of sexual abuse. Rather than an outright regulation of otherwise protected free speech."
*127 Tape Recording, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 2681, Mar. 8, 1991, Tape 50, Side A (statement of Sen. Larry Hill).
Assistant United States Attorney, Jeffrey Kent, testified after Senator Hill and echoed much of the Senator's concerns and proposed solutions. As a member of the government's Task Force on Sex Crimes Against Children, he reassured the members of the subcommittee that H.B. 2681 was "not a witch hunt; [we're] not book burners." Tape Recording, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 2681, Mar. 8, 1991, Tape 50, Side A (statement of Assistant U.S. Attorney Jeffrey Kent). Kent, an advocate for the "Spare the Child" movement, which was working towards removing requirements that a child must testify at trial in order to convict their abuser, explained:
"This bill allows us to focus on the target group, which are essentially your predatory pedophiles, without the need of *661 ever having to put the children through the trauma of court room testimony to get where we want to go.
"* * * * *
"We're not only protecting the children, but we're protecting society at large from a serious social problem."
Tape Recording, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 2681, Mar. 8, 1991, Tape 50, Side A (statement of Assistant U. S. Attorney Jeffrey Kent).
Kent submitted written testimony in which he further explained:
"Hardly surprising, studies and experience have confirmed that possessors of large collections of child pornography are almost always themselves pedophiles. These collections often include photos of their victims. Thus, prosecution for possession of child pornography has the dual advantages of sparing the youthful victims the trauma of reliving sexually abusive episodes during public trials and at the same time of focusing on the target group-typically promiscuous and predatory pedophiles.
"The destructive impact of child sexual abuse is enormous. Victims carry with them a psychological trauma, which places them at tremendous disadvantages in the future. In the perverse and frequently unfair vagaries of life, those who are abused often become abusers themselves and engage in other criminal conduct at levels statistically higher than the population at large. Thus, the problem involves not just the tragedy of the immediate victim but a fallout that affects all of society.
"Thus, a law criminalizing the very possession of child pornography has these numerous advantages:
"1. It attacks a vital link in the distribution chain-the possessor, who creates the demand for such material;
"2. It aims to obliterate potentially permanent records of haunting and traumatic sexual exploitations of children;
"3. It eliminates materials, which are oftentimes used to seduce other children into believing that such conduct with an adult is okay; and
"4. It focuses on a group, which promiscuously preys on children, without the need to have children relive these traumas in open court."
*662 Exhibit C, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 2681, Mar. 8, 1991 (letter dated June 5, 1990 and addressed to "Concerned Citizen" accompanying testimony of Assistant U.S. Attorney Jeffrey Kent).
Attorney Warren Deras testified before the subcommittee in agreement with Kent. Deras clarified:
"And keep in mind that when we talk about child pornography under this statute, we are not talking about mere nudity. We're not talking about text that somebody wrote that doesn't involve a real child. We are only talking about visual reproductions of genuine obscenity involving a child."
Tape Recording, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 2681, Mar. 8, 1991, Tape 50, Side A (statement of Warren Deras).
In addition to legal experts, law enforcement also testified and submitted exhibits in *128 support of H.B. 2681. Major Dean L. Renfrow, the Criminal Investigation Division Director of the Oregon State Police, testified:
"The State Police have been heavily involved in the pursuit of individuals that sexually victimize children. We have participated in undercover operations with local and Federal agencies and have observed a continuing stream of child pornography entering this state and in the possession of child molesters. These persons often contact one another through publications and then loan and exchange child pornography. The Department has been involved in several investigations in which undercover officers were introduced to child molesters by responding to advertisements in publications.
"* * * * *
"For every picture of a child engaging in sexually explicit conduct, there is [at] least one child that has been victimized and exploited. It makes no difference where the child is from or where the picture was taken.
"1. Oregon Criminal Statutes do not adequately control this form of deviancy. No Oregon law prohibits the possession of photos of the child victims. Pictures are commonly passed from one abuser to another.
"2. The crime is a silent one that exploits children and gratifies and encourages the adult perpetrators.
*663 "3. We believe that there is a direct relationship between those persons that have an interest in child pornography and the physical sexual exploitation of children. Persons that sexually abuse children frequently take photographs of these victims to relive the events through fantasies. These collections of photographs often lead to the abuser seeking out additional victims.
"4. For every person identified as having a need to possess child pornography there are many more unidentified. Conviction for possession would identify those persons and lead to others who profit from and encourage sexual exploitation of children.
"* * * * *
"We feel that prohibiting possession of child pornography would serve to:
"1. Identify offenders;
"2. lead to the sources of production and dissemination of child pornography;
"3. identify previously unknown victims of child abuse and break the cycle of abuse; and
"4. enhance the states ability to protect children from sexual abuse and exploitation.
"This bill provides a needed 'tool' to protect our children. Under current law in Oregon, possession of child pornography materials is lawful."
Exhibit F, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 2681, Mar. 8, 1991 (accompanying testimony of Major Dean L. Renfrow).
4. 2011-Modification of ORS 163.670
A major change in the law criminalizing child pornography came in 2011 with Senate Bill (S.B.) 803. S.B. 803 came into being as a response to an Oregon Supreme Court ruling that, under current law at that time, viewing child pornography online without saving the images or paying to view the material was not illegal. Senator Joanne Verger testified on April 13, 2011 before the Senate Committee on Judiciary, explaining:
*664 "I just want to relate to you, you know about the Supreme Court case, and also that it noted in the case of Oregon versus Barry Lowell Barger [349 Or. 553, 247 P.3d 309 (2011) ] that Oregon has not banned the viewing of child pornography, unless it was paid for and that that viewing does not equal possession and so that's the basis of the necessity for Senate Bill 803. In order to go forward and allow the Attorney General to be able to prosecute these cases, then we have to change that and, as the Supreme Court noted.
"The predatory environment of our children, not only in this way of viewing pornography but across the board in society today, must get the attention of the Oregon legislature and so I would encourage you to pass this legislation and allow the Attorney General to prosecute these cases *129 and, but, most of all, we need to protect our children who are the most vulnerable in our society."
Audio Recording, Senate Committee on Judiciary, S.B. 803, Apr. 13, 2011, at 03:05 (statement of Sen. Joanne Verger), https://olis.leg.state.or.us/liz/2011R1/committees/SJUD/2011-04-13-08-30/Agenda (accessed Aug. 30, 2018).
Next, Senator Laurie Monnes Anderson testified:
"I'm here today to support Senate Bill 803 and in January the Oregon Supreme Court did rule that under current law it is not a crime to view child pornography and this legislation will close that loophole. Our children must and need to be protected and under no circumstances should the sexual exploitation of innocent children be tolerated, in any way or form. I believe that child sexual exploitation to be one of the worst, most heinous crimes imaginable and therefore I do want to make it easier for prosecutors to pursue and convict cases of child pornography. Using our children in such a terrible way is intolerable and we need to be absolutely clear, in this state of ours, that viewing child pornography on the web is wrong, it is illegal, and we have to discourage the activity, this activity, and this bill actually helps us get there."
Audio Recording, Senate Committee on Judiciary, S.B. 803, Apr. 13, 2011, at 04:50 (statement of Sen. Laurie Monnes Anderson), https://olis.leg.state.or.us/liz/2011R1/committees/SJUD/2011-04-13-08-30/Agenda (accessed Aug. 30, 2018).
*665 Senator Suzanne Bonamici had the following exchange with the Deputy Attorney General from the Oregon Department of Justice, Mary Williams, during committee testimony:
"[MARY WILLIAMS]: What this does is it allows us to modernize the language of the statute to address some of the newer technology in ways in which child pornography can be viewed and accessed. It brings the language into, basically the same language that we see in the federal laws that prohibit this kind of, uh, intentional viewing of child pornography and will enable us to continue prosecuting a broader class of these offenses. And, so, we're in support of this legislation.
"[SENATOR BONAMICI]: It's my understanding that, that what is considered child pornography is already in the statute and this doesn't change what is considered to be child pornography, it just deals with viewing versus possession?
"[MARY WILLIAMS]: Yes, that is correct. This doesn't change the definition of child pornography, just the, um, the possession and the access and how that part of the statute is defined."
Audio Recording, Senate Committee on Judiciary, S.B. 803, Apr. 13, 2011, at 06:55 (statements of Deputy Attorney General Mary Williams and Sen. Suzanne Bonamici), https://olis.leg.state.or.us/liz/2011R1/committees/SJUD/2011-04-13-08-30/Agenda (accessed Aug. 30, 2018).
Additionally, the committee's counsel, Aaron Knott, explained to the members that S.B. 803 provided:
"Two modifications to the child pornography laws. The first of these is that it modifies the definition of visual recording being a visual recording of child pornography to include photographs, films, videotapes, and computer or other digital pictures, regardless of the manner in which the recording is stored. The practical implication of this is it attempts to capture instances where somebody views pornography that may not be stored on their computer but does not download it. Similarly, the second part of Senate Bill 803 is, it expands, or at least modifies, the definition of knowingly possess to include knowingly accesses or views a visual depiction of sexually explicit conduct."
*666 Audio Recording, Senate Committee on Judiciary, S.B. 803, Apr. 13, 2011, at 01:50 (statement of Committee Counsel Aaron Knott), https://olis.leg.state.or.us/liz/2011R1/committees/SJUD/2011-04-13-08-30/Agenda (accessed Aug. 30, 2018).
Knott also prepared the House Committee on Judiciary Staff Measure Summary and explained the background of S.B. 803:
" ORS 163.665 [to] 163.693 govern the prosecution of crimes involving child pornography.
*130 ORS 163.665 contains the definitions applicable within this section. ORS 163.665(4) defines 'visual depiction' as including but not limited to photographs, films, videotapes, pictures or computer or computer generated images or pictures, whether made or produced by electronic, mechanical or other means. [Senate Bill 803] modifies the definition of 'visual depiction' by replacing photographs, films, videotapes, pictures or computers with 'visual recording,' which is subsequently defined in a new subsection as including but not limited to photographs, films, videotapes and computer and other digital pictures, regardless of the manner in which the recording is stored. The practical import of this modification is an attempt to capture instances where a defendant views pornography on a third party website but does not download the images to a computer, print the images or retain the images.
" ORS 163.684 [to] 163.389 criminalizes the knowing possession of a visual depiction or recording of sexually explicit conduct involving a child. [Senate Bill 803] expands the definition of 'knowingly possess' to include knowingly accesses or views a visual depiction of sexually explicit conduct. This also attempts to capture the access of child pornography on websites without the retention of a physical or electronic copy of the materials viewed."
Staff Measure Summary, House Committee on Judiciary, S.B. 803, June 2, 2011 (prepared by Committee Counsel Aaron Knott).
As S.B. 803 moved out of the Senate and into the House for debate, proponents continued to describe the problem the legislation aimed to fix. The Attorney General for the State of Oregon, John Kroger, testified:
*667 "It is a response to the Oregon Supreme Court's decision which held that merely accessing child pornography on the internet is not illegal under Oregon state law. The problem here, if the committee will recall, is that Oregon's child pornography statute was never really updated for the internet age. It defined the crime in terms of simple possession and there was a legal debate about whether accessing child pornography on the internet was to possess it. The Supreme Court ruled that absent the decision to download it, print it, or purchase it, one did not possess child pornography simply by accessing it on the web, leaving Oregon, as far as we know, it's the only state in the country right now where viewing child pornography on the internet is not a crime. The bill would fix that loophole and has three safeguards to make sure that people who did not intentionally access this material are not somehow caught up, if somehow child pornography were downloaded by someone else, or by some kind of spyware on the computer. It requires for the government to obtain a conviction for the defendant to knowingly access the material."
Audio Recording, House Committee on Judiciary, S.B. 803, May 9, 2011, at 03:18 (statement of Attorney General John Kroger), https://olis.leg.state.or.us/liz/2011R1/committees/HJUD/2011-05-09-13-00/Agenda (accessed Aug. 30, 2018).
S.B. 803 became effective upon its approval on June 23, 2011. Oregon Laws 2011, chapter 515, section 2, was codified as ORS 163.670, describing using a child in a display of sexually explicit conduct. The law has not been modified since 2011. Having examined the history of ORS 163.670, we now turn to the second statute of import for this case, ORS 137.690 -requiring a mandatory minimum sentence of 25 years for major felony sex crimes.
D. ORS 137.690 and Measure 73
ORS 163.670 is the statute that criminalizes this defendant's sexting behavior. The punishment defendant faces as a result of his behavior was made law by a citizen initiative effort, Ballot Measure 73 (2010). Measure 73 was described in media, press releases, news coverage, debates, educational leaflets, and voter pamphlets as targeting and getting tough on repeat sex crimes and drunken drivers through increased mandatory punishment requirements.
*668 The Oregon Voters' Pamphlet listed the Measure 73 ballot title as "Requires increased minimum sentences for certain repeated sex crimes, incarceration for repeated driving under influence." Official Oregon Voters'
*131 Pamphlet, General Election, Nov. 2, 2010, 54. The voters' pamphlet provided an explanatory statement, which read:
"Ballot Measure 73 sets mandatory minimum sentences for certain repeat sex offenders and certain repeat intoxicated drivers.
"The measure provides that any person convicted of a 'major felony sex crime' must be imprisoned for 25 years if the person has a 'previous conviction' for a major felony sex crime. Under current law, a person convicted of a single major felony sex crime must serve a minimum sentence ranging from 5 years, 10 months to 25 years, depending on the circumstances of the offense and the offender.
"The measure defines 'major felony sex crime' to mean rape in the first degree, sodomy in the first degree, unlawful sexual penetration in the first degree and using a child in a display of sexually explicit conduct.
"The measure defines 'previous conviction' to include two or more convictions in a single sentencing proceeding when the convictions are imposed for crimes committed in separate criminal episodes. It is possible for this measure to apply when the offender has not served previous time in prison for a major felony sex crime."
Voters' Pamphlet at 56.
The voters' pamphlet listed the measure's chief petitioners as Doug Harcleroad and Kevin L. Mannix. The pamphlet also listed some arguments in favor of Measure 73, furnished by the chief petitioners as well as Tara Lawrence, the Executive Director of the Oregon Anti-Crime Alliance, a political action committee that Harcleroad and Mannix are a part of. The proponents claimed:
"These are the worst of the sexual predators. We need to keep them behind bars to protect the public.
"* * * * *
"Measure 73 puts the worst repeat violent sex offenders behind bars for a long time. Measure 73 holds the offenders *669 accountable and prevents these criminals from hurting more victims.
"* * * * *
"MEASURE 73 IS CAREFULLY TARGETED AT REPEAT VIOLENT SEX OFFENDERS AND THIRD TIME DRUNKEN DRIVERS. VOTE YES TO MAKE U.S. ALL SAFER.
"* * * * *
"Measure 73 provides justice to victims of crime and protects society.
"Sexual crimes are among the worst crimes because they injure victims both physically and emotionally. Even if the physical scars are healed, the emotional scars remain for the rest of the victim's life.
"Important concerns for victims are that other people be protected from the worst of these sexual predators, and that victims not be called in for repeated hearings about whether or not a major sex offender should be released.
"Measure 73 guarantees that a major sex offender who commits a second Class A felony sex crime will serve at least 25 years in prison on the second conviction."
Voters' Pamphlet at 58 (capitalization in original).
Proponents Mannix, Harcleroad, and Lawrence advocated for Measure 73 leading up to the general election on November 2, 2010. Mannix penned an editorial titled, "Measure 73: An overdue reform of public safety," which ran in The Oregonian newspaper on September 21, 2010, and explained:
"Measure 73 imposes mandatory minimum 25-year sentences on the four worst categories of sex offenders. These are the serial rapists and serial child pornographers who need to be kept off the streets and who were not rehabilitated after a first conviction. Measure 73 applies only to them for repeat convictions."
Kevin Mannix, Measure 73: An overdue reform of public safety , The Oregonian (Sept. 21, 2010), https://www.oregonlive.com/opinion/index.ssf/2010/09/measure_73_an_overdue_reform_o.html (accessed Aug. 30, 2018).
*670 Mannix repeated similar talking points when he was interviewed by journalist Nigel Duara for an Associated Press article called, "Oregon Measure Seeks Harsher Penalties *132 for Sex Crime," published on October 11, 2010. Duara wrote:
"Some opponents, including Oregon's ACLU chapter, say the initiative is too broad. While major felony sex crimes include rape, sodomy and unlawful penetration, they also include 'using a child in display of sexually explicit conduct.' That could include 'sexting,' the transmission of sexual images via mobile phones.
"The ACLU argues that, under the initiative, a teenager as young as 15 with no previous convictions who sends sexual images to more than one person could be classified as a repeat sex offender, and be automatically sentenced to 25 years in prison. Mannix called that a 'phantom issue[.]' "
Nigel Duara, Oregon Measure Seeks Harsher Penalties for Sex Crime , The Associated Press (Oct. 11, 2010), https://www.theskanner.com/news/8-news/8531-oregon-measure-seeks-harsher-penalties-for-sex-crime-2010-10-12 (accessed Aug. 30, 2018).
Mannix spoke about Measure 73 on the Oregon Public Radio program Think Out Loud on September 23, 2010. He explained Measure 73, stating:
"Out of the 35 sex crimes on the books in the state, this selects the four worst, Class A felony sex crimes which it specifically addresses, and that is rape in the first degree, sodomy in the first degree, unlawful sexual penetration in the first degree, or using a child in the display of sexually explicit conduct. These are the four worst Class A felony sex crimes in the state and this act specifies that on a second conviction, for any one of these crimes, that you would serve a mandatory minimum of 25 years in state prison.
"* * * * *
"This group of offenders, and it's a small group, are the worst of the worst predatory sex criminals, and having gone out and committed this crime and been convicted for it and having committed another crime, they are the folks that, frankly, a lot of us would like to see incarcerated for the rest of their life. They are not amenable to treatment, *671 they are predatory, they are dangerous to the public. But in order to be proportional, there's a Jessica's Law that says if an adult rapes a child there's a mandatory minimum of 25 years in prison. To be proportional, we said, well on this second conviction there'll be a mandatory minimum prison term of 25 years and it's designed to pull these people off the streets so they cannot victimize other Oregonians."
Measure 73, Think Out Loud, Oregon Public Radio (Sept. 23, 2010), https://www.opb.org/radio/programs/thinkoutloud/segment/measure-73 (accessed Aug. 30, 2018).
After being asked how many people might be effected by Measure 73 a year, Mannix responded, "Perhaps 15 to 20, it's a very small group of the worst sex offenders." Id.
Measure 73's proponents participated in debates and interviews throughout 2010, advocating in favor of the measure. Doug Harcleroad, former District Attorney for Lane County and attorney for the Oregon Anti-Crime Alliance-of which Kevin Mannix served as President and Tara Lawrence served as Executive Director-participated in a debate hosted by the City Club of Portland on September 17, 2010. Harcleroad and moderator, Judge Ed Jones, had the following exchange:
"[MODERATOR]: Under Measure 73, a 25 year mandatory minimum sentence for sex crimes could apply to minors, age 15 or older, and multiple counts of transmitting sexual images could be considered prior criminal episodes. Given this, Measure 73 could be used to prosecute teenagers for sexting, the practice of sending other teenagers sexually explicit messages or photographs between mobile phones. Would you consider a 25 year sentence for a repeat juvenile sexter appropriate?
"* * * * *
"[HARCLEROAD]: This will not happen. That's a rouse. It's nonsense. I've looked at the data for the last four years on this particular statute that's in the measure, I looked at the 15, 16, 17 year olds * * *.
"I looked at the data and what I can tell you is that [for] 15, 16, and 17 year olds, there were 2 convictions. I doubt they *133 were sexting convictions[.] * * * So, for the last 4 years, it would never have happened, a sexting charge like this. *672 "Now, the other thing, we know, under the Rodriguez and the Buck cases, that you can't have disproportionate sentences and in a far less serious cases, sex abuse cases, the court said you can't have disproportionate sentences. The DAs know that. They will not be charging sexting with this crime. Won't happen!"
Doug Harcleroad, Ballot Measure 73 Debate-Sentencing, The City Club of Portland (Sept. 17, 2010), https://www.youtu.be/f7UnBdK12vs?+=38m31s (accessed Aug. 30, 2018).
The City Club also produced a companion report on Measure 73. The committee putting together the report interviewed Mannix. Mannix responded to questions about Measure 73 and its harsh penalties for nonviolent crimes like sexting, stating that those concerns were "phantom issue[s]." A City Club Report on Ballot Measure 73 , 93 Supplement to the City Club of Portland Bulletin, 19, 6 (Oct. 22, 2010), http://members.pdxcityclub.com/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=b0210676-d2fe-4dd2-92bb-59bd9991c359 (accessed Aug. 30, 2018).
The report, produced and made available to the voting electorate, specifically drew upon comments by Mannix and Harcleroad indicating that teenage sexting would not be subject to a 25-year sentence due to constitutional proportionality concerns. It stated, in part:
"Proponents of Measure 73 believe this prosecutorial discretion works to ensure that prosecutors will not charge defendants with Measure 73's increased penalties when the underlying facts suggest that such charges would be inappropriate, such as the application of the sex crimes portion of Measure 73 to teenagers engaged in sexting. Proponents explain that prosecutors would be reluctant to bring charges which would result in 25-year mandatory minimum sentences for 'sexting' by minors in light of the recent Oregon Supreme Court decision in State v. Rodriguez . The Supreme Court found that the imposition of mandatory Measure 11 sentences were unconstitutional in some cases because the penalties were disproportionate to the underlying offenses."
Id. at 9 (footnote omitted).
*673 II. APPLICATION
The above legislative history reveals two things. First, the Oregon legislature has never identified sexting as a social ill that it set about to deliberately criminalize, or affix a penalty to. To be sure, that behavior unquestionably can fall under the wording of ORS 163.670, but it does so not through deliberate legislative choice, but through historical happenstance. ORS 163.670, a law repeatedly enacted to target child pornography perpetrated as abuse against children, now can be read to criminalize voluntary sexting among young people due to the evolution of technology and social norms, not purposeful legislative action.
Second, ORS 137.690, passed by the voters as part of Measure 73, was designed and marketed to the voting public as a measure targeting a small group of offenders described as "the worst," "predators," "violent," "serial rapists," and "serial child pornographers." Proponents of the measure estimated it would affect a very small group, "15 to 20, * * * a very small group of the worst sex offenders." It was never conceived of as targeting sexting among young people, an activity being engaged in by upwards of 25 percent of teenagers. When questioned about sexting, proponents of Measure 73 repeatedly called it a "phantom issue" or "a rouse" and insisted that the statute would not be used to punish teen sexting. Finally, when pushed, proponents of Measure 73 indicated that any use of the statute to penalize sexting with a 25-year sentence would force the courts to act, as the Oregon Supreme Court did in Rodriguez/Buck , and declare such as sentence unconstitutionally disproportionate.
The history behind ORS 163.670 and ORS 137.690 fundamentally affects this court's approach to a proportionality analysis. As the Oregon Supreme Court has instructed, when this court looks to "whether the legislature's imposition of a particular penalty (or range of penalties) for an offense had a 'reasonable'
*134 or 'an arguably rational basis' ( Jensen ) or a 'rational basis' ( Isom )" this court is "apply[ing] the Sustar test." Wheeler , 343 Or. at 670, 175 P.3d 438. That is, this court "look[s] to the legislative enactment of the particular penalties at issue as an external source of law to assist in determining *674 whether those penalties would shock the moral sense of reasonable people." Id . at 671, 175 P.3d 438.
As discussed previously, the legislature can fail in its obligation under Article I, section 16, in two ways, either by (a) failing to engage in its obligation to proportion at the outset, or by (b) enacting a sentence beyond the limits of what Article I, section 16, permits. All of the proportionality cases from this court, as well as the Oregon Supreme Court, have dealt with the latter scenario. In each of those cases, there was a deliberate choice by the legislature or the voters and that choice was evaluated to see whether it went beyond that which was permitted by the constitution. But here, the legislature never engaged in the first step. There was never an attempt to criminalize the behavior, nor to proportion a penalty. When the legislature fails to engage in that essential predicate obligation, it falls to the courts to do so-and, in fact, that was expressly told to the voters. Thus, unlike previous cases in which this court has been appropriately highly cautious to supplant legislative sentencing determinations, here, the court has been invited in . When the proponents of a sentencing statute conceive of constitutional disproportionality as a quasi-safety valve against a sentencing statute's application in certain factual circumstances, the usual, and entirely appropriate, judicial reticence to declare a sentence disproportionate as-applied in those circumstances is at its nadir.
Against that backdrop, we then apply the traditional Rodriguez/Buck factors. Here, the severity of the penalty is great, one of the harshest in Oregon. In contrast, the gravity of the crime must be viewed, in light of the legislative history, as low. While certainly there may be serious social ills from sexting, the legislature's failure to take up that issue directly counsels against concluding that the gravity matches the child pornography concerns that motivated the passage of ORS 163.670, or any of its subsequent iterations. As the Oregon Supreme Court explained in Rodriguez/Buck , when the statutory definition of an offense describes a broad swath of actual conduct, that may be an indication that the application of the statute to a particular defendant's conduct will result in a disproportionate sentence under *675 Article I, section 16. 347 Or. at 61, 217 P.3d 659 ("[W]hen a defendant is convicted for engaging in only more minor conduct encompassed within the statute, the defendant may plausibly argue that the mandatory sentence, as applied to the particular facts of his or her case, is unconstitutionally disproportionate."). That is especially true when what brings defendant's acts under the ambit of the statute is historical evolution, not legislative purpose.
Similarly, in comparing the penalty here against that which would be imposed for related crimes, we see incongruity. Here, the voluntary sexting of a sexual image among teenagers is punished more harshly than the actual physical sexual contact. In this case, for example, defendant received a greater sentence for having a picture of a breast voluntarily sent to him than if he had physically touched the breast.
If we look to the other crimes set out in ORS 137.690, only three other offenses-rape in the first degree, sodomy in the first degree, and unlawful sexual penetration in the first degree-are subject to the same mandatory 25-year sentence as defendant's possession of a consensually taken and voluntarily transmitted photograph. Each of those other offenses requires physical contact with the victim and each is the most serious (first) degree of that particular offense. Conduct satisfying the elements of those other offenses typically involves the use of force or a victim who is exceptionally vulnerable due to age, relation to the defendant, or a disability of some sort. See, e.g. , ORS 163.375 (defining rape in the first degree).
Most telling of all, however, is when we consider the one time the legislature did enact a bill penalizing activity similar to sexting. In 2013, Representative Jason Conger introduced House Bill 3015, which targeted the dissemination of sexted images without *135 the image creator's consent. That bill did not receive a hearing, but the core idea found its way into House Bill 3194. That bill, among many other things, modified the harassment statute to create a subsection related to the dissemination of images:
"(1) A person commits the crime of harassment if the person intentionally:
*676 "(a) Harasses or annoys another person by:
"* * * * *
"(C) Distributing a visual recording * * * of the other person engaged in sexually explicit conduct, * * * or in a state of nudity, * * * when the other person is under 18 years of age at the time of the recording."
ORS 166.065(1)(a)(C).
That statute does not speak directly to the activity present in this case-requesting a sexted image be sent, then subsequently being in receipt of an image voluntarily sent by the person depicted in the image. Rather, that statute speaks to the potential further distribution of an image-the forwarding of a sexted image to another. And that activity, arguably more egregious, is classified as a Class A misdemeanor. ORS 166.065(4)(b). Thus, the defendant in this case was subject to 25 years in prison for requesting a sexted image and being in possession of a voluntarily sent image. Yet, if he had then distributed that image to others, he would have been subject to no more than a year in jail.
Finally, we look to the defendant's criminal history. And here, even if we view ORS 137.690 as a recidivist sentencing scheme, thus requiring that we look to the entirety of defendant's other conduct, including other charges and even uncharged conduct, we cannot find the imposition of the sentence in this case proportionate. While defendant perpetrated a number of serious crimes against multiple victims, none of his other conduct falls under ORS 137.690 . A 25-year sentence for sexting-an act that the voters did not intend to be subject to that punishment-cannot be boot-strapped into proportionality by justifying it on the backs of other crimes that Measure 73 and the voters expressly did not think was deserving of that enhanced sentence. In short, none of defendant's other abusive conduct-repeated and heinous as it was-is the type of conduct that any legislative body has purposefully sought to punish with a 25-year sentence.
For those reasons, I conclude that the imposition of multiple 25-year sentences, pursuant to ORS 137.690, for defendant's convictions under ORS 163.670 for sexting would *677 shock the conscience of reasonable people and are therefore disproportionate and in violation of Article I, section 16.
Accordingly, I respectfully concur.
Egan, C. J., DeVore, J., Lagesen, J., DeHoog, J., and Aoyagi, J., join the concurrence.
The majority views this as a case about "sexting" and concludes that a 300-month sentence for that offense is unconstitutional. I have sympathy for the view that a sentence of that length is disproportionate for the offense of sexting as the majority and concurring opinions describe it, viewing such conduct in isolation. The problem is that, in this case, viewing the conduct in isolation is exactly what we are not allowed to do. I write separately not because I believe that the 300-month sentence in this case is appropriate (my views in that regard are irrelevant), but because I believe the majority has misapplied the Oregon Constitution.
My disagreement with the majority concerns the role that defendant's other criminal conduct plays in the proportionality analysis under Article I, section 16. That conduct included, apart from sexting, numerous physical sex offenses that Oregon's policymakers (including, via the initiative process, the voters) have deemed very serious. In fact, defendant committed so many offenses against so many victims that the trial court (as defendant conceded below) could have imposed a sentence longer than 300 months without even applying a mandatory sentence for sexting.[1]
*136 As it happened, the trial court did impose a 300-month sentence as required for defendant's multiple sexting offenses, and then imposed all of defendant's other sentences concurrently with it. Because the 300-month sentence was triggered by the sexting offenses, the majority limits its *678 proportionality analysis to whether sexting alone can justify such a sentence. But the trial court made it clear that it was imposing that sentence as punishment for all of defendant's conduct. And, in this as-applied challenge, that is how we must view defendant's sentence-as punishment not only for sexting, but for his other far more serious conduct, which included penetrative sexual acts with girls as young as 12 and 13. When one accounts for that conduct, as the Supreme Court requires us to, I conclude that defendant's 300-month sentence is not unconstitutional as applied to him, even if the same sentence might be unconstitutional in other circumstances.
I begin with certain facts that are peripheral to the majority's analysis but that are essential to mine.
Defendant was convicted of 18 counts based on his crimes against eight different victims ranging in age from 12 to 16. The crimes occurred during a span of more than two years, but 14[2] of the crimes occurred when defendant was 18. The crimes included one count of first-degree sexual abuse against 13-year-old CB when defendant was 17; one count of second-degree unlawful sexual penetration against 12-year-old JB when defendant was 16; a second count of second-degree unlawful sexual penetration against JB when she was 13 and defendant was 18; one count each of third-degree rape and third-degree sodomy (one month apart) against 14-year-old BB when defendant was 18; one count of fourth-degree assault constituting domestic violence against 16-year-old PG when defendant was 18; and one count of second-degree encouraging child sexual abuse against 16-year-old PG when defendant was 18. In addition to those seven counts, defendant was convicted of 11 counts of using a child in a display of sexually explicit conduct, which he committed with each victim except JB.
Under Ballot Measure 11, ORS 137.700, defendant was subject to mandatory minimum sentences of 75 months for the count of first-degree sexual abuse against CB and 75 months for each of the two counts of unlawful sexual penetration against JB. Under the sentencing guidelines that *679 apply to his remaining offenses, defendant was also subject to sentences of up to 30 months each for the counts of third-degree rape and third-degree sodomy against BB; 30 months for the count of felony fourth-degree assault against PG; and 16 months for the count of second-degree encouraging sexual abuse against PG. The two convictions as to JB and the two convictions as to PG arose from four distinct criminal episodes.
For his first count of using a child in a display of sexually explicit conduct, defendant was subject to a mandatory minimum sentence of 70 months under Ballot Measure 11. For his second through eleventh counts of that same crime, defendant was subject to mandatory sentences of 300 months as a repeat offender under Ballot Measure 73, ORS 137.690. In his sentencing memorandum, defendant argued that both a 70-month sentence and the 300-month sentence would be disproportionately long for sexting, "given the nature of the offense and [defendant's] personal circumstances." Defendant's main argument was that, compared to other conduct encompassed by the offense of using a child in a display of explicit conduct-such as depictions of young children engaged in sex with adults-defendant's conduct was much less harmful. Defendant also cited his immaturity at the time of his crimes. Defendant acknowledged to the trial court, however, that, even if the court departed downward *137 from either the Measure 11 or the Measure 73 mandatory sentences, "there is so much time here that you could get back up to 300 months plus without using" either of those statutes.
The state argued that the mandatory sentences were proportional for several reasons: (1) the evidence supported a finding that defendant collected explicit images from the victims in order to "groom" them for sexual contact; (2) his child-display convictions involved numerous victims; and (3) in addition to sexting, defendant was convicted of "hands on sex offenses" against those victims. The state also pointed out that defendant had been warned by the police about his conduct (as a result of the report by CB's mother) but continued to engage in criminal sexual activity with young girls. The state requested a total aggregate sentence of 300 months; in doing so, the state observed that a much *680 longer sentence was possible if the trial court chose to sentence defendant consecutively for his various crimes against each of the eight victims.
At the sentencing hearing, the court chose to impose a 300-month sentence and explained its reasoning:
"The legal arguments I, frankly, am going to leave a lot of those legal arguments up to a higher court to determine.
"I will say this: As far as the particular facts of this case, what strikes [sic ], [defendant], is the fact that the eight victims that you victimized were particularly vulnerable in this instance, they were young, obviously and they were so desperate for your attention, approval, and love.
"And that is the reason that you chose them. That is the reason why, by your own words, you played them . And that is the reason why they sent you their picture and allowed you to engage in the sex acts that you did.
"And that is significant to me because in the legislative scheme, if you will, I can't help but think that it-that is one of the reasons why there is a minimum sentence, because of the vulnerability of these particular victims. And they were, in fact, vulnerable.
"I remember very distinctly each and every one of them when they testified and how they testified, even [PG], and how she reacted to having to be in this position as a witness, but some of the others too. That is significant.
"And I am not at all minimizing your situation. I am very sympathetic. It may not seem that way. I am sympathetic to who you are at this particular point in your life, your family's particular situation, and where you have put them. And I know you will regret it now and every single day going forward.
"But this was not one specific incident. This was not two incidents of a selfie * * *. This was a huge totality of circumstances that included taking pictures and then acting upon them and using the self-esteem of these victims and crashing their self-esteem and using the sex acts in addition.
"And that combined with the number of victims is why this case is this case and why we are here and why it is going to be the sentence that it is."
(Emphases added.)
*681 Two observations are important. First, the state argued that defendant's sexting was a way of "grooming" the victims of his multiple "hands on" sex offenses, and the trial court clearly agreed that the sexting was part and parcel of a larger pattern of serious criminal activity. Second, although defendant argued that a 300-month sentence for his sexting offenses was disproportionate, defendant also conceded that the court could disregard that mandatory sentence and still get "back up to 300 months plus" in light of the other counts and the mandatory sentences that they carried. Notably, defendant did not argue that a sentence of "300 months plus" calculated that way would be unconstitutional. Defendant has never made that argument.
The heart of the proportionality inquiry under Article I, section 16, is "whether the length of the sentence would shock the moral sense of reasonable people." State v. Ryan , 361 Or. 602, 612, 396 P.3d 867 (2017). The Supreme Court has issued several decisions that guide our analysis of this as-applied *138 challenge. The majority and I interpret those cases differently.
The relevant cases begin with State v. Wheeler , 343 Or. 652, 175 P.3d 438 (2007). In that case, the court upheld consecutive life sentences for each of the defendant's 18 convictions committed against three victims. Id. at 654, 175 P.3d 438. In doing so, the court engaged in a comprehensive examination of Article I, section 16, and earlier cases applying that provision. The court observed that its previous statement of the relevant analysis-whether a particular penalty " 'shocks the moral sense of all reasonable people as to what is right and proper under the circumstances,' " id. at 670, 175 P.3d 438 (quoting Sustar v. County Court for Marion Co. , 101 Or. 657, 665, 201 P. 445 (1921) (emphasis added) )-was not intended to be taken literally. Instead, according to the court, it was an attempt "to articulate a standard that would find a penalty to be disproportionately severe for a particular offense only in rare circumstances." Id. The Wheeler court observed:
"[T]his court's cases do not provide a comprehensive understanding of the scope of Article I, section 16, but they do provide some perspective on certain aspects of proportionality requirement. The court has used the test of whether the penalty was so disproportioned to the offense as to *682 'shock the moral sense of reasonable people' and ordinarily has deferred to legislative judgments in assigning penalties for particular crimes, requiring only that the legislature's judgments be reasonable. The cases permit the legislature to impose enhanced sentences on recidivists, even if those sentences would be disproportionate when applied to a defendant without prior convictions."
Id. at 676-77, 175 P.3d 438. The Wheeler court rejected the defendant's argument that his sentences were unconstitutionally disproportionate because they did not involve a physical assault or permanent physical injury, reasoning:
"Sex crimes may or may not result in permanent physical injury, but the legislature is entitled to presume that they are a serious matter in light of the potential for both physical and psychological injury and that lengthy sentences are necessary to protect the public from further harm by recidivists. See Or. Const., Art. I, § 15 (protection of society is an appropriate goal of criminal punishment)."
Id. at 679-80, 175 P.3d 438.
Following Wheeler , the Supreme Court decided State v. Rodriguez/Buck , 347 Or. 46, 217 P.3d 659 (2009). In that case, the court addressed the proportionality of mandatory 75-month Measure 11 sentences for defendants without prior convictions who each committed a single act of first-degree sexual abuse, ORS 163.427. See Rodriguez/ Buck , 347 Or. at 49-50, 217 P.3d 659. Both offenses involved brief touching over the victims' clothing. In evaluating the defendants' sentences under Article I, section 16, the Rodriguez/Buck court identified "at least three factors" that bear upon the proportionality inquiry: "(1) a comparison of the severity of the penalty and gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." 347 Or. at 58, 217 P.3d 659. The court did not declare those factors to be an exhaustive list of considerations; instead, the court explained that those factors "provide[d] a sufficient basis to decide" whether the two sentences on review satisfied the proportionality requirement. See id. at 58, 217 P.3d 659 n. 6.
In discussing the role of a defendant's criminal history in the analysis, the Rodriguez/Buck court observed that *683 "[t]raditional understandings of proportionality, as well as this court's cases, require us to consider whether a defendant is a repeat offender by considering previous criminal convictions and whether there is evidence of multiple instances of uncharged wrongful conduct." Id. at 78, 217 P.3d 659. The court found it significant that the 75-month mandatory minimum sentences for first-degree sex abuse applied irrespective of whether the defendant had prior convictions, criminal charges, arrests, or police contact. Id. at 77, 217 P.3d 659. The court emphasized that the defendants "not only had no prior convictions or charges of any kind, but, in each case, the brief touching occurred on a *139 single occasion." Id. at 78, 217 P.3d 659. The court observed that, in "the more common first-degree sexual abuse cases," the "contact is not only far more physically invasive and sexually charged, but it has occurred multiple times, rather than only once." Id. The court therefore concluded that "the absence of any criminal convictions and the single occurrence of the wrongful conduct " indicated that the 75-month sentences were disproportionate. Id. (emphasis added).
Later, in State v. Althouse , 359 Or. 668, 375 P.3d 475 (2016), the Supreme Court upheld a life sentence without the possibility of parole for a person convicted of public indecency, imposed pursuant to ORS 137.719 (providing that the presumptive sentence for a felony sex crime is life imprisonment without the possibility of release or parole if the defendant had been sentenced for felony sex crimes "at least two times prior to the current sentence"). The court explained that, for two reasons, the facts relevant to the defendant's as-applied challenge were "not limited to the facts that gave rise to his 2011 conviction for public indecency":
"First, the trial court sentenced defendant pursuant to a repeat-offender statute, which authorizes an enhanced sentence for a third felony sex conviction. When a court imposes an enhanced sentence based on a repeat-offender statute, we consider a defendant's criminal history in determining whether the sentence is proportionate to the crime. Second, defendant has raised an as-applied challenge to his sentence, which requires consideration not only of his past convictions but also of his past instances of relevant uncharged misconduct."
*684 Id. at 678-79, 375 P.3d 475 (citations omitted). Accordingly, the court considered the "defendant's history of charged and uncharged sex offenses" as stated in the "uncontested preliminary sentence investigation." Id. at 679, 375 P.3d 475.
In applying the three factors identified in Rodriguez/ Buck , the Althouse court essentially combined the first and third factors. That is, in comparing the severity of the penalty with the gravity of the offense (first factor), the court did not "focus solely on the last offense that [the defendant] committed"; instead, it focused on "the gravity of his criminal history." 359 Or. at 686, 375 P.3d 475. The court quoted its decision in Tuel v. Gladden , 234 Or. 1, 379 P.2d 553 (1963), for the proposition that
" '[h]abitual criminal statutes are based upon the belief that the criminal, as well as the crime, is a material factor to be considered in fixing the sentence. If the criminal is a menace to the community, his sentence should be aimed at offering the most protection to the community, regardless of the relative innocuousness of the particular crime for which he is now convicted.' "
Althouse , 359 Or. at 684, 375 P.3d 475 (quoting Tuel , 234 Or. at 6, 379 P.2d 553 ; brackets omitted). The court also quoted its decision in Jensen v. Gladden , 231 Or. 141, 372 P.2d 183 (1962), for the proposition that, when it comes to "repeat sexual offenders," "whether an enhanced sentence for that conduct would 'shock the moral sense would, of course, depend upon the seriousness of [the] repetitive sexual conduct of the kind punished by the statute and the danger that it forecasts for others unless the defendant is segregated from society.' " Althouse , 359 Or. at 685, 375 P.3d 475 (quoting Jensen , 231 Or. at 144-45, 372 P.2d 183 ; brackets omitted). The court went on to conclude that, "[g]iven the seriousness of defendant's repeated sexual misconduct and the danger that it forecasts for others, we cannot say that imposing a presumptive life sentence in response to defendant's pattern of criminal behavior violated Article I, section 16." Id. at 687, 375 P.3d 475.
Next, in State v. Davidson , 360 Or. 370, 380 P.3d 963 (2016), the court held that a life sentence imposed for public indecency-under the same statute at issue in Althouse -violated the proportionality requirement, despite the defendant's "lengthy and varied" criminal history, including three *685 prior convictions for public indecency. The court reasoned that the defendant's failure to reform after multiple prior convictions "is only one [consideration] among others," and because the defendant's offenses of conviction and criminal history did not "reflect that he pose[d] a significant physical danger to the public," that indicated that a life sentence *140 was disproportionate. Id. at 387-88, 380 P.3d 963. The court pointed to the fact that the defendant's criminal history "almost exclusively consisted of low-level offenses," and "it did not include sexual offenses that entailed physical contact with victims or that appeared to specifically target child victims." Id. at 387, 380 P.3d 963.
Most recently, in Ryan , the court held that a trial court erred in failing to consider the defendant's intellectual disability in the proportionality analysis, holding that "[e]vidence of an offender's intellectual disability," if credited, is "relevant to a proportionality determination where sentencing laws require the imposition of a term of imprisonment without consideration of such evidence." 361 Or. at 620-21, 396 P.3d 867.
Taken together, these cases establish that the proportionality inquiry is a broadly contextual one in which the characteristics of the defendant and his conduct, not just the narrow facts of the underlying offense, matter. See Althouse , 359 Or. at 684, 375 P.3d 475 (observing that "the criminal, as well as the crime, is a material factor" (quoting Tuel , 234 Or. at 6, 379 P.2d 553 ) ). The "gravity of the offense," for purposes of the first Rodriguez/ Buck factor, must be assessed in the context of the defendant's overall criminal conduct. That is why the court in Althouse essentially considered the gravity of the offense (first factor) and the defendant's criminal history (third factor) as one.
Therefore, in this as-applied challenge to the length of defendant's sentence, we must take into account not only the specific facts underlying the sexting offenses, but other relevant context, including the other criminal activity[3] for which defendant was prosecuted below.
*686 When we do, we see that defendant conjoined his sexting conduct with multiple sex offenses that society has deemed serious enough to warrant mandatory sentences of as long as 75 months. As noted, defendant was subject to mandatory minimum sentences of 75 months for first-degree sexual abuse; 75 months each for two counts of second-degree unlawful sexual penetration; 25 months each for one count of third-degree rape and third-degree sodomy; 25 months for one count of fourth-degree assault constituting domestic violence; and 15 months for one count of second-degree encouraging child sexual abuse. Furthermore, because those counts involved distinct criminal episodes and multiple victims, the trial court was entitled to impose those sentences consecutively.
In other words, without even considering the sexting offenses, defendant was exposed to a total possible sentence in excess of 300 months, simply because of the number of other offenses and victims. Defendant conceded as much, and he has never asserted that such an aggregate sentence-if imposed for his crimes other than sexting-would have been unconstitutional. (Nor has the majority.[4] ) But, if defendant could constitutionally have been sentenced to greater than 300 months without even accounting for his sexting offenses, then it follows that a sentence of 300 months is not unconstitutional as applied to defendant . The result can hardly *141 be different if one adds the sexting offenses back into the equation.
Although the majority acknowledges the seriousness of defendant's other conduct, the majority ultimately omits it *687 from the proportionality analysis. Instead of asking whether a 300-month sentence is disproportionate for a person who committed sexting and the other crimes that defendant committed , the majority narrows the inquiry to whether a 300-month sentence can be imposed for sexting. Thus, in applying the first Rodriguez/Buck factor (gravity of the offense), the majority defines the "offense" strictly as defendant's repeated violations of ORS 163.670 -contrary to Althouse 's direction that the gravity of the offense must be considered in light of related criminal conduct. Having so defined it, the majority then concludes that defendant's conduct was relatively minor compared to other conduct encompassed by that statute and compared to other "felony sex crimes" under ORS 137.690. 293 Or. App. at 638-39, 430 P.3d at 114-15.
The majority makes two main points in defense of its result. Neither is persuasive.
First, the majority goes to great lengths to distinguish Ballot Measure 73 from a true "recidivist" statute as was at issue in Althouse. 293 Or. App. at 621-26, 430 P.3d at 105-08. According to the majority, the Supreme Court's reasoning in Althouse "depends on the principle that the legislature is entitled to provide enhanced sentences when a defendant has been proven highly resistant to reform because the person has reoffended after the state has previously punished him or her." 293 Or. App. at 625-26, 430 P.3d at 107-08. As an initial matter, neither Althouse nor the court's other decisions have ever said that an offender must be a "recidivist" in that specific sense in order for his or her criminal history to be relevant. In fact, the court has repeatedly said that relevant context includes uncharged misconduct. See, e.g. , Rodriguez/Buck , 347 Or. at 78, 217 P.3d 659 (court should consider "evidence of multiple instances of uncharged wrongful conduct"); Althouse , 359 Or. at 679, 375 P.3d 475 ("defendant has raised an as-applied challenge to his sentence, which requires consideration not only of his past convictions but also of his past instances of relevant uncharged misconduct"). Uncharged conduct, by definition, results in no conviction or attempted rehabilitation.
More fundamentally, the majority's effort to distinguish Ballot Measure 73 from other "recidivist" statutes is simply beside the point, because the majority's analysis is *688 aimed entirely at demonstrating why a 300-month sentence cannot be justified for sexting . As already discussed, that is not the question raised by this as-applied challenge.
That brings us to the majority's second reason for excluding defendant's other serious sex offenses from the proportionality analysis. According to the majority, it is wrong to review defendant's 300-month sentence as the "package" sentence for all of defendant's 18 counts of conviction, even though that is how the trial court saw it. Instead, the majority reads the Supreme Court's cases as compelling us to consider only the specific offense for which that sentence was imposed. 293 Or. App. at 625, 430 P.3d at 105.
The majority cites no language requiring that approach. To be sure, both Rodriguez/Buck and Althouse dealt with sentences that were imposed for a single count of conviction. Rodriguez/Buck involved defendants with no criminal histories who committed single, isolated instances of conduct that ranked at the low end of the spectrum of severity encompassed by the defined statutory crimes. Thus, the question in that case was whether a particular sentence was disproportionate for a defendant who committed the underlying crime of conviction and no other offense. In Althouse , the question was whether a particular sentence was disproportionate for a defendant who committed the underlying crime of conviction and who also had past convictions for that and other offenses. In neither case did the Supreme Court have reason to address whether other crimes sentenced in the same proceeding should inform the proportionality analysis. From that fact, the majority apparently concludes that crimes sentenced in the same proceeding cannot inform the proportionality analysis. But that does not logically follow *142 from anything that the Supreme Court has said, and it runs contrary to the court's repeated admonitions that, in an as-applied challenge, we must take full account of a defendant's related criminal activity-even uncharged misconduct.
Ultimately, the flaw in the majority's reasoning is demonstrated by the fact that nothing will prevent the trial court, on remand, from achieving the same 300-month aggregate sentence by imposing consecutive sentences on *689 the counts other than sexting. Thus, defendant's victory today may be fleeting.[5] That mere possibility illustrates the problem with the majority's view. For if Article I, section 16, is meant to account for the moral conscience of the community to ensure that excessive punishments are not imposed, then it is strange to regard a 300-month sentence as permissible if computed as "30 times ten" or "50 times six," yet morally shocking if computed as "300 plus zero." Reasonable members of the community would weigh proportionality by considering the length of the total sentence in light of defendant's overall conduct and the number of victims, not by scrutinizing the math.
The majority's decision today may or may not result in a shorter sentence for defendant. If the court determines that a shorter aggregate sentence is appropriate, that may represent a sound exercise of judicial discretion on the facts of this case. My purpose in writing separately is to emphasize that the trial court did not violate the Oregon Constitution in imposing the sentence required by statute.
Accordingly, I respectfully dissent.
Armstrong, J., Hadlock, J., Tookey, J., Shorr, J., and Powers, J., join in the dissent.

Article I, section 16, equally applies to the voters when they enact sentencing laws through the initiative process.

This is not to be confused with legislative intent as that term might more commonly be used in statutory construction. For a proportionality inquiry, we look to the legislative purpose and whether the legislature engaged in its constitutional obligation to deliberately proportion the sentence to the social harm.

An examination of legislative purpose-the rational basis connecting the legislatively enacted sentence to the social harm that the legislature sought to penalize-is itself closely governed by the other constitutional obligation imposed on the legislature when enacting penalties-Article I, section 15, of the Oregon Constitution. That provision sets the permissible legislative purposes, requiring that "[l]aws for the punishment of crime shall be founded on these principles: protection of society, personal responsibility, accountability for one's actions and reformation."

See generally Kelsey Stiegman, The 8 Kinds of Selfie Faces Every Girl Makes On Instagram , Seventeen (Dec. 15, 2015), https://www.seventeen.com/beauty/a36410/types-of-selfie-faces-on-instagram/ (accessed Aug. 29, 2018).

See generally Brenden Gallagher, The 15 Types of Selfies , Complex (Oct. 16, 2013), https://www.complex.com/pop-culture/2013/10/the-15-types-of-selfies/the-beach-feet-brag-selfie (accessed Aug. 29, 2018).

See generally Sarah Lindig, Study Says There Are Three Types of Selfie-Takers-Which Are You? , Harper's Bazaar (Jan. 15, 2017), https://www.harpersbazaar.com/culture/features/a19983/three-types-of-selfie-takers-says-study/ (accessed Aug. 29, 2018) (Researchers at Brigham Young University "identified three archetypal motivations among those who take and share selfies: communicators, autobiographers, and self-publicists.").

This distinguishes true sexts from sext messages forwarded without permission, or obtained without the sender's knowledge, any of which might more properly be categorized as "revenge porn."

Under the Oregon Constitution, crimes against multiple victims are separately punishable. Or. Const., Art. I, § 44 (1)(b) ("No law shall limit a court's authority to sentence a criminal defendant consecutively for crimes against different victims."). Based on the number of offenses, criminal episodes, and victims, defendant could have received an aggregate sentence of 331 months even if he had not been sentenced for "sexting" at all. I do not understand the majority to disagree with that point.

The record is ambiguous as to whether the conduct underlying one of the counts of conviction occurred on defendant's 18th birthday or the day before.

The reason for considering a defendant's other criminal conduct is that the heart of the proportionality inquiry under Article I, section 16, is "whether the length of the sentence would shock the moral sense of reasonable people." Ryan , 361 Or. at 612, 396 P.3d 867. Reasonable people consider context. A criminal act that appears one way in a vacuum may take on an entirely different character if it occurs as part of a larger course of conduct. Consider, on one hand, an 18-year-old who engages in innocuous and playful "sexting" with a 17-year-old romantic partner, and, on the other hand, an 18-year-old who uses sexting as a grooming tool with girls four or five years younger than him, with whom he then has sex. For their "sexting," both individuals have committed exactly the same statutory offense of using a child in a display of sexually explicit conduct. But they have done very different things. Thus, the concurring opinion's effort to define an abstract concept called "sexting," an activity in which many teenagers engage, is misguided. Even assuming that the concurrence's information is basically accurate, the most we learn is that many teenagers engage in sexting. That tells us nothing about how many 18-year-olds use sexting in the course of committing more serious sex offenses against young children.

See also State v. Parker , 259 Or. App. 547, 549, 314 P.3d 980 (2013) ("Defendant does not provide, nor are we aware of, any authority requiring a proportionality analysis with regard to a defendant's aggregate sentence.").

The majority suggests that my analysis is informed by a belief about what the trial court might have done differently in the absence of the 300-month mandatory sentence, or what the trial court may do on remand. 293 Or. App. at 621, 430 P.3d at 105. To be clear, the record, in my view, does not permit any strong inference about what the trial court would have done if it had not been bound by the 300-month sentence under ORS 137.690. And we cannot know what will happen on remand. Neither question is pertinent to the constitutional inquiry.